# UNITED STATES COURT OF APPEALS

# FOR THE NINTH CIRCUIT

| | |
|---|---|
| CENTRAL CALIFORNIA ENVIRONMENTAL JUSTICE NETWORK, a nonprofit corporation, COMMITTEE FOR A BETTER ARVIN, a nonprofit corporation, MEDICAL ADVOCATES FOR HEALTHY AIR, a nonprofit organization, and SIERRA CLUB, a nonprofit corporation;<br><br>　　　　Petitioners,<br><br>　　vs.<br><br>U.S. ENVIRONMENTAL PROTECTION AGENCY, LEE ZELDIN, in his official capacity as Administrator of the U.S. Environmental Protection Agency, and MICHAEL MARTUCCI, in his official capacity as Acting Regional Administrator for Region IX of the U.S. Environmental Protection Agency,<br><br>　　　　Respondents. | No.<br><br>**PETITION FOR REVIEW**<br><br>Agency No. EPA-R09-OAR-2025-2466 |

Pursuant to section 307(b)(1) of the Clean Air Act, 42 U.S.C. § 7607(b)(1), and Rule 15(a) of the Federal Rules of Appellate Procedure, Central California Environmental Justice Network, Committee for a Better Arvin, Medical Advocates for Healthy Air, and Sierra Club petition this Court for review of the final rule entitled "Approval of Clean Air Plans; San Joaquin Valley, California; Contingency Measures for 1997 Ozone Standards." Respondents U.S. Environmental Protection Agency, Lee Zeldin, and Michael Martucci published the final rule in the *Federal Register* on March 23, 2026 at 91 Fed. Reg. 13747 (Mar. 23, 2026), attached as Exhibit 1.

Respectfully submitted this 20th day of May, 2026.

LAW OFFICE OF BRENT J. NEWELL

/s/ Brent J. Newell
BRENT J. NEWELL, California Bar No. 210312
LAW OFFICE OF BRENT J. NEWELL
245 Kentucky Street, Suite A4
Petaluma, CA 94952
(661) 586-3724
brent@lawofficenewell.com

Attorney for Petitioners Central California Environmental Justice Network, Committee for a Better Arvin, Medical Advocates for Healthy Air, and Sierra Club

1

PETITION FOR REVIEW

## CERTIFICATE OF SERVICE FOR ELECTRONIC FILING

I hereby certify that I caused to be electronically filed the **Petition for Review** on this date with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the Appellate Case Management System. I certify that I caused to be served the foregoing document on this date by Certified Mail to the following unregistered case participants:

Lee Zeldin, Administrator
U.S. Environmental Protection
    Agency
Office of the Administrator
Mail Code: 1101A
1200 Pennsylvania Avenue, N.W.
Washington, DC 20460

Michael Martucci
Acting Regional Administrator,
Region 9
U.S. Environmental Protection
    Agency
Mail Code ORA-1
75 Hawthorne Street
San Francisco, CA 94105

Sean Donahue
General Counsel
U.S. Environmental Protection
    Agency
Office of General Counsel
Mail Code: 2310A
1200 Pennsylvania Avenue, N.W.
Washington, DC 20460

Todd Blanche
Acting Attorney General of the
United
    States
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, DC 20530-0001

Craig H. Missakian
United States Attorney for the
Northern District of California
c/o Civil Process Clerk
United States Attorney's Office for
the Northern District of California
450 Golden Gate Avenue, Box
36055
San Francisco, CA 94102

Adam R.F. Gustafson
Principal Deputy Assistant Attorney
General
Environment & Natural Resources
    Division
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

2

PETITION FOR REVIEW

I certify under penalty of perjury that the foregoing is true and correct.

Executed on May 20, 2026 in Petaluma, California.

s/ Brent J. Newell

PETITION FOR REVIEW

# Exhibit 1


Galveston-Brazoria 2008 eight-hour ozone serious nonattainment VOC

RACT demonstration'' at the end of the table to read as follows:

**§ 52.2270  Identification of plan.**

\* \* \* \* \*

(e) \* \* \*

### EPA APPROVED NONREGULATORY PROVISIONS AND QUASI-REGULATORY MEASURES IN THE TEXAS SIP

| Name of SIP provision | Applicable geographic or non-attainment area | State submittal/ effective date | EPA approval date | Comments |
|---|---|---|---|---|
| \* \* | \* \* | | \* | \* |
| VOC RACT negative declarations for fiberglass boat manufacturing materials, manufacturing of pneumatic rubber tires, flat wood paneling coatings, letterpress printing, and automobile and light-duty truck assembly coatings sectors. | Houston-Galveston-Brazoria, TX 2008 8-hour ozone NAAQS nonattainment area. | 5/13/2020 | 3/23/2026, 91 FR [INSERT **FEDERAL REGISTER** PAGE WHERE THE DOCUMENT BEGINS]. | For the HGB Serious classification. |
| Houston-Galveston-Brazoria 2008 eight-hour ozone serious nonattainment NOₓ RACT demonstration. | Houston-Galveston-Brazoria, TX 2008 8-hour ozone NAAQS nonattainment area. | 5/13/2020 | 3/23/2026, 91 FR [INSERT **FEDERAL REGISTER** PAGE WHERE THE DOCUMENT BEGINS]. | |
| Houston-Galveston-Brazoria 2008 eight-hour ozone serious nonattainment VOC RACT demonstration. | Houston, Galveston, Brazoria, TX 2008 8-hour ozone NAAQS nonattainment area. | 5/13/2020 | 3/23/2026, 91 FR [INSERT **FEDERAL REGISTER** PAGE WHERE THE DOCUMENT BEGINS]. | |

[1] As revised 9/26/01.

\* \* \* \* \*

[FR Doc. 2026–05596 Filed 3–20–26; 8:45 am]

**BILLING CODE 6560–50–P**

---

## ENVIRONMENTAL PROTECTION AGENCY

### 40 CFR Part 52

[EPA–R09–OAR–2025–2466; FRL–13043–02–R9]

### Approval of Clean Air Plans; San Joaquin Valley, California; Contingency Measures for 1997 Ozone Standards

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Final action.

**SUMMARY:** The Environmental Protection Agency (EPA) is taking final action to approve under the Clean Air Act (CAA or ''Act'') a state implementation plan (SIP) submission from the State of California as meeting the attainment-related contingency measure requirements for the 1997 ozone national ambient air quality standards (NAAQS or ''standards'') in the San Joaquin Valley, California, Extreme ozone nonattainment area. The SIP revision is titled ''California Smog Check Contingency Measure State Implementation Plan Revision'' (September 15, 2023) (''Smog Check Contingency Measure SIP''). The EPA's approval relies on the previously approved contingency measure for the 1997 ozone NAAQS for the San Joaquin

Valley and the justifications for not adopting additional contingency measures that provide for the recommended amount of emissions reductions for such measures. Based on our final approval, the EPA is also finalizing our determination that the State of California has fulfilled the commitment made by the State in connection with a previous approval action to develop, adopt, and submit attainment contingency measures for the San Joaquin Valley Extreme nonattainment area for the 1997 ozone NAAQS meeting the requirements of the CAA.

**DATES:** This action is effective April 22, 2026.

**ADDRESSES:** The EPA has established a docket for this action under Docket ID No. EPA–R09–OAR–2025–2466. All documents in the docket are listed on the *https://www.regulations.gov* website. Although listed in the index, some information is not publicly available, *e.g.,* Confidential Business Information (CBI) or other information whose disclosure is restricted by statute. Certain other material, such as copyrighted material, is not placed on the internet and will be publicly available only in hard copy form. Publicly available docket materials are available through *https://www.regulations.gov,* or please contact the person identified in the **FOR FURTHER INFORMATION CONTACT** section for additional availability information. If you need assistance in a language other than English or if you are a person with

a disability who needs a reasonable accommodation at no cost to you, please contact the person identified in the **FOR FURTHER INFORMATION CONTACT** section.

**FOR FURTHER INFORMATION CONTACT:** Laura Lawrence, Planning Section (AIR–2–1), EPA Region IX, 75 Hawthorne Street, San Francisco, CA 94105, telephone number: (415) 972–3407, email address: *lawrence.laura@epa.gov.*

**SUPPLEMENTARY INFORMATION:** Throughout this document, ''we,'' ''us,'' and ''our'' refer to the EPA.

### Table of Contents

I. Summary of Proposed Action
II. Public Comments and EPA Responses
  A. Comments From Valley Air Advocates
  B. Comments From Central Valley Air Quality Coalition (CVAQ)
  C. Comments From California Environmental Voters (CEV)
  D. Comments From Citizens Rulemaking Alliance (CRA)
  E. Comments From Concerned Citizen
  F. Comments From Anonymous Commenters
III. EPA Action
IV. Statutory and Executive Order Reviews

### I. Summary of Proposed Action

On November 14, 2025, the EPA proposed to approve California's Smog Check Contingency Measure State Implementation Plan Revision (''Smog Check Contingency Measure SIP''), submitted by the California Air Resources Board (CARB), as meeting the attainment-related requirements for contingency measures under CAA section 172(c)(9) for the San Joaquin Valley nonattainment area for the 1997

ozone standards.[1] The EPA previously approved the Smog Check Contingency Measure as a stand-alone contingency measure, and we indicated at the time we approved the measure that we would be taking a separate action on the Smog Check Contingency Measure SIP to evaluate whether the Smog Check Contingency Measure SIP fulfills the attainment-related contingency measure requirements under CAA section 172(c)(9) for the San Joaquin Valley for the 1997 ozone NAAQS.[2] Our November 24, 2025 proposed action and this final action constitute the separate, later action referred to in our final action on the Smog Check Contingency Measure.

In section I. of our proposed action, we presented background information on the ozone NAAQS,[3] the nonattainment designation and classification of the San Joaquin Valley for the 1997 ozone NAAQS, and the resultant contingency measure SIP obligations, and we summarized our previous actions on the contingency measure requirement for the San Joaquin Valley for the 1997 ozone NAAQS.[4] In section II. of the proposed action, we summarized the contingency measure SIP requirements under the CAA and the EPA's implementing regulations, relevant EPA guidance, and legal precedent, including a brief discussion of relevant decisions by the Ninth Circuit Court of Appeals[5] and the D.C. Circuit Court of Appeals.[6]

In addition, in section II. of our proposed action, we described the EPA's long-standing approach to contingency measures and the EPA's revised approach for addressing the contingency measure SIP requirements, as presented in the EPA's "Guidance on the Preparation of State Implementation Plan Provisions that Address the Nonattainment Area Contingency Measure Requirements for Ozone and Particulate Matter (December 3, 2024) ("Revised Contingency Measure

Guidance").[7] The principal differences between the revised guidance and previous guidance on contingency measures relate to the EPA's recommendations concerning the specific amount of emissions reductions that implementation of contingency measures should achieve and the timing for when the emissions reductions from the contingency measures should occur.

The previous EPA recommendation for the amount of emissions reductions to achieve from implementation of contingency measures was one year's worth of reasonable further progress (RFP), which, for ozone, is three percent of baseline emissions of VOC. The previous recommendation for time over which the reductions from contingency measures may occur was one year. The Revised Contingency Measure Guidance introduces "one year's worth of progress" ("OYW of progress"), a metric intended to be more closely tied to the emissions reductions required for attainment of the NAAQS, for determining the amount of emissions reductions that contingency measures should achieve.

The Revised Contingency Measure Guidance also provides recommended procedures for developing a demonstration, if applicable, that the area lacks sufficient feasible contingency measures to achieve the recommended amount of reductions, which builds on existing guidance that the state provide a reasoned justification (referred to herein as an "infeasibility demonstration") for why the smaller amount of emissions reductions from contingency measures is appropriate.

In section III. of the proposed rule, we described the Smog Check Contingency Measure SIP and evaluated how the District and CARB complied with the procedural requirements for adopting SIP revisions and the contingency measure requirements under the CAA.

The Smog Check Contingency Measure SIP includes a contingency measure ("Smog Check Contingency Measure") that would narrow the exemption for new vehicles from emissions testing under the Smog Check program from eight model years old to seven model years old in a given nonattainment area if triggered by an EPA finding of failure to meet an RFP milestone or an EPA finding of failure to attain the NAAQS by the applicable attainment date for such area. As noted in the proposed rule, we approved the Smog Check Contingency Measure as a stand-alone contingency measure in a

separate rulemaking,[8] and, within the San Joaquin Valley, the Smog Check Contingency Measure has already been triggered as a result of the EPA's determination that the San Joaquin Valley failed to attain the applicable attainment date for the 1997 ozone NAAQS.[9]

The Smog Check Contingency Measure SIP also includes estimates of emissions reductions from implementation of the Smog Check Contingency Measure in the relevant years and nonattainment areas to which the measure applies, CARB's evaluation of various mobile and area source categories to identify other feasible contingency measures, and an infeasibility demonstration that provides CARB's justification for not adopting additional contingency measures for sources under CARB jurisdiction (*i.e.,* other than the Smog Check Contingency Measure).

In addition to the Smog Check Contingency Measure SIP, CARB and the District recommended that the EPA take into consideration the District's and CARB's "Ozone Contingency Measure State Implementation Plan Revision for the 2008 and 2015 8-hour Ozone Standards (April 25, 2024)" ("2024 SJV Ozone Contingency Measure Plan"), which addresses the contingency measure SIP requirements for the San Joaquin Valley for the 2008 and 2015 ozone NAAQS.[10] The 2024 SJV Ozone Contingency Measure Plan relies on two adopted contingency measures and commitments for five additional contingency measures for San Joaquin Valley for the 2008 and 2015 ozone NAAQS. It also includes the District's infeasibility demonstration for stationary and area sources under District jurisdiction,[11] CARB's expanded infeasibility demonstration for certain area sources under State jurisdiction,[12] and the District's

---

[1] 90 FR 51029 (November 14, 2025).

[2] 89 FR 56222, at 56227 (July 9, 2024).

[3] Ground-level ozone pollution is formed from the reaction of volatile organic compounds (VOC) and oxides of nitrogen ($NO_X$) in the presence of sunlight. These two pollutants, referred to as ozone precursors, are emitted by many types of sources, including on-and off-road motor vehicles and engines, power plants and industrial facilities, and smaller area sources such as lawn and garden equipment, architectural coatings, and other types of consumer products.

[4] 77 FR 12652 (March 1, 2012).

[5] *Bahr* v. *EPA,* 836 F.3d 1218, 1235–1237 (9th Cir. 2016) and *Assoc. of Irritated Residents* v. *EPA,* 10 F.4th 937, 946–47 (9th Cir. 2021) ("*AIR* v. *EPA*" or "*AIR*").

[6] *Sierra Club* v. *EPA,* 21 F.4th 815, 827–828 (D.C. Cir. 2021).

[7] The EPA announced the availability of the guidance document at 89 FR 101602 (December 16, 2024).

[8] 89 FR 56222 (July 9, 2024).

[9] 90 FR 46065 (September 25, 2025).

[10] See letter from Ariel Fideldy, Chief, CARB Air Quality Planning Branch to Michelle Angelich, Acting Director, EPA Region IX Air and Radiation Division, dated October 16, 2025, and letter from Sheraz Gill, Deputy Air Pollution Control Officer, SJVUPACD to Edie Chang, Deputy Executive Officer, CARB, dated October 10, 2025. CARB submitted the 2024 SJV Ozone Contingency Measure Plan to the EPA on April 29, 2024. The EPA proposed conditional approval of the 2024 SJV Ozone Contingency Measure Plan with respect to the 2008 ozone NAAQS at 89 FR 85119 (October 25, 2024).

[11] 2024 SJV Ozone Contingency Measure Plan, sections 5.1–5.7 and 5.12.

[12] 2024 SJV Ozone Contingency Measure Plan, section 5.10.

infeasibility demonstration for transportation control measures.[13]

As noted in the proposed rule, we took into account the infeasibility demonstrations included in the 2024 SJV Ozone Contingency Measure Plan in our evaluation of the Smog Check Contingency Measure SIP with respect to contingency measure SIP requirements for the San Joaquin Valley for the 1997 ozone NAAQS. Our reliance on the infeasibility demonstrations included in the 2024 SJV Ozone Contingency Measure Plan is appropriate even though it was not developed or submitted to address the contingency measure requirements for the 1997 ozone NAAQS because control strategies for all three ozone NAAQS (the 1997 ozone NAAQS, the 2008 ozone NAAQS, and the 2015 ozone NAAQS) relate to the same averaging period (8-hour average), the same precursor emissions ($NO_X$ and VOC) and the same emissions sources, the same planning emissions inventories (summertime average day), and the same types of control measures.

As explained in more detail in the proposed rule, we preliminarily found that the infeasibility demonstrations provided in the Smog Check Contingency Measure SIP and the 2024 SJV Ozone Contingency Measure Plan support the conclusion that the contingency measures already adopted and approved, plus the contingency measures to which the District and CARB have committed currently, constitute the entire set of feasible contingency measures for ozone precursor emissions in the San Joaquin Valley. We noted that, because the identified feasible contingency measures have been selected to address only the 2008 and 2015 ozone NAAQS, they are not available for the 1997 ozone NAAQS, which means that the only feasible contingency measure for the purposes of the 1997 ozone NAAQS is the Smog Check Contingency Measure.

Therefore, we preliminarily concluded that, based on achieving a portion of OYW of progress for $NO_X$ and VOC reductions from a contingency measure (the Smog Check Contingency Measure) that meets the requirements of CAA section 172(c)(9) and the reasoned justifications contained in the infeasibility demonstrations, the Smog Check Contingency Measure SIP fulfills the attainment-related contingency measure SIP requirements for the 1997 ozone NAAQS for the San Joaquin Valley and thereby fulfills the commitment the State made in

connection with the EPA's approval of the attainment plan for the 1997 ozone NAAQS. We are confirming that preliminary conclusion in this final rule.

Please see our proposed rule for more information.[14]

## II. Public Comments and EPA Responses

The EPA's proposed action provided a 30-day public comment period. During this period, we received comments from seven individuals and groups.

In the following paragraphs, we summarize the substantive comments objecting to our proposed action and provide our responses. All comment letters in their entirety, including attachments where provided, are available in the docket for this rulemaking.

The EPA's proposed action provided a 30-day public comment period. During this period, we received comments from seven individuals and groups.

In the following paragraphs, we summarize the substantive comments objecting to our proposed action and provide our responses. All comment letters in their entirely, including attachments where priovided, are avaiable in the docket for this rulemaking.

### A. Comments From Valley Air Advocates [15]

*Comment A–1:* Valley Air Advocates note that, in the proposed action, the EPA does not calculate OYW of RFP and should make the effort to include this information in the final rule for a complete record. Valley Air Advocates further assert that the EPA fails to provide a reasoned explanation for why it may approve the Smog Check Contingency Measure SIP with respect to the attainment-related contingency measure requirements for the 1997 ozone NAAQS based on a different standard from that which the Agency applied in 2012 to approve the contingency measure element of the attainment plan for the 1997 ozone NAAQS.

*Response to Comment A–1:* Valley Air Advocates are correct that the EPA applied the Agency's contingency measure guidance in effect at that time in approving the contingency measure element of the attainment plan for the San Joaquin Valley for the 1997 ozone NAAQS as meeting the RFP-related

contingency measure requirements of the CAA.[16] The EPA's previous contingency measure guidance cited OYW of RFP as the amount of emissions reductions contingency measures should achieve to meet the CAA contingency measure requirements and allowed states to rely on emissions reductions that were in excess of the reductions needed for RFP and attainment to meet contingency measure requirements.

However, the EPA did not approve the contingency measure element of the attainment plan as meeting the attainment-related contingency measure requirements of the CAA on that same basis. The EPA relied on CAA section 182(e)(5) to approve the contingency measure element of the attainment plan as meeting the attainment-related contingency measure requirements of the CAA on the basis of a commitment by CARB to develop, adopt and submit by 2020 attainment contingency measures meeting the requirements of CAA section 172(c)(9), pursuant to CAA section 182(e)(5).[17]

In our previous action on the attainment plan for the San Joaquin Valley for the 1997 ozone NAAQS, we indicated that, following the State's submittal of the additional attainment-related contingency measures, the EPA would approve or disapprove the submission for compliance with the contingency measure requirements pursuant to CAA section 110.[18]

In our proposed rule, we proposed to approve the Smog Check Contingency Measure SIP (which represents the submission from the state to fulfill the commitment approved in 2012) using the Agency's contingency measure guidance in effect at the time of the action. The Agency's current contingency measure guidance cites OYW of progress (rather than RFP) as the amount of emissions reductions contingency measures should achieve to meet the CAA contingency measure requirements, but it does not allow states to rely on emissions reductions that were in excess of the reductions needed for RFP and attainment to meet contingency measure requirements. In both the previous action in 2012 and the proposed action in 2025, the EPA appropriately applied the Agency's contingency measure guidance in effect at the time of the EPA action.

As to the previous recommendation of OYW of RFP, the Valley Air Advocates

---

[13] 2024 SJV Ozone Contingency Measure Plan, section 5.11.

[14] 90 FR 51029 (November 14, 2025).

[15] Comments were submitted by the Central California Environmental Justice Network, Committee for a Better Arvin, Medical Advocates for Healthy Air and Sierra Club (collectively, referred to herein as "Valley Air Advocates."

[16] 76 FR 57846, at 57864 (September 16, 2011); finalized at 77 FR 12652 (March 1, 2012).

[17] 77 FR 12652, at 12670 (March 1, 2012). See also 40 CFR 52.220(c)(396)(ii)(A)(2)(i).

[18] 76 FR 57846, at 57864 (September 16, 2011).

are correct in that the amount of emissions reductions calculated in terms of OYW of RFP is greater than the amount calculated in terms of OYW of progress, but the difference is not as great as described in the comment. Under the previous EPA contingency measure guidance, the recommended amount of reductions for contingency measures would have been 17.0 tons per day (tpd) of $NO_X$, 13.7 tpd of VOC, or some combination of contingency measures that would reduce $NO_X$ and VOC such that the total reduction is equivalent on a percentage basis to a three percent reduction in base year VOC emissions.[19] In contrast, OYW of progress amounts to 5.0 tpd or 4.1 tpd for $NO_X$ and VOC, respectively. Under the EPA's revised contingency measure guidance, the recommended amount (OYW of progress) applies to both $NO_X$ and VOC where reductions of both precursors are needed for attainment.

More importantly, in the case of the EPA's review of the Smog Check Contingency Measure SIP for compliance with the attainment-related contingency measure requirements for the 1997 ozone NAAQS, the EPA would have expected the State to provide a reasoned justification for not providing contingency measures that would achieve the recommended amount, whether that amount equals OYW of RFP or OYW of progress. The State has provided a reasoned justification in the form of infeasibility demonstrations that show that there are no additional feasible contingency measures for ozone precursors in the San Joaquin Valley other than the Smog Check Contingency Measure and the District's contingency measures already adopted or committed to for the 2008 and 2015 ozone NAAQS.

*Comment A–2:* The Valley Air Advocates assert that EPA's approval of the Smog Check Contingency Measure SIP violates the anti-backsliding provisions in CAA section 172(e) and the specific anti-backsliding provisions associated with the revocation of the 1997 ozone NAAQS in 40 CFR 51.1105(a)(1). The Valley Air Advocates indicate that the approval violates the anti-backsliding provisions by effectively eliminating the requirement by reducing the required emissions reductions to a *de minimis* level.

*Response to Comment A–2:* The EPA promulgated anti-backsliding provisions consistent with the principles in CAA section 172(e) to govern the transition from the revoked 1997 ozone NAAQS to

the more stringent 2008 ozone NAAQS.[20] The anti-backsliding provisions identify those SIP requirements that continue to apply to an air quality planning area for the 1997 ozone NAAQS if they applied to the area at the time of revocation of the 1997 ozone NAAQS, and the contingency measure requirement is included among the list of "applicable requirements" that continue to apply after revocation.[21]

Neither CAA section 172(e) nor EPA's anti-backsliding provisions bear on the question of whether the Smog Check Contingency Measure SIP meets the attainment-related contingency measure requirements for the San Joaquin Valley for the 1997 ozone NAAQS. Rather, CAA section 172(e) and EPA's anti-backsliding provisions bear on the question of which requirements continue to apply to a given area after revocation of the NAAQS, not how a state complies with the requirement that has been established as one that continues to apply.

In this case, the EPA finds that the Smog Check Contingency Measure SIP meets the applicable contingency measure requirements under CAA section 172(c)(9) for the revoked 1997 ozone NAAQS through the State's adoption of a measure (the Smog Check Contingency Measure), the contingency measure infeasibility demonstration included in the Smog Check Contingency Measure SIP, and the contingency measure infeasibility demonstrations included in the 2024 SJV Ozone Contingency Measure Plan. In developing the infeasibility demonstrations in the 2024 SJV Ozone Contingency Measure Plan, the District identified five additional contingency measures that the District has now committed to adopt for the 2008 and 2015 ozone NAAQS. While these contingency measures have been determined by the District to be feasible, the District has already committed to adopt them for the current 2008 and 2015 ozone NAAQS and is not required to adopt them for the revoked 1997 ozone NAAQS.

*Comment A–3:* The Valley Air Advocates assert that the EPA

unlawfully and arbitrarily proposes approval of the Smog Check Contingency SIP as meeting the requirements of CAA section 172(c)(9) for the 1997 ozone NAAQS because the EPA's new interpretation weakens the amount of reductions required by the EPA-approved SIP. Valley Air Advocates also assert that the EPA has unlawfully and arbitrarily failed to provide a reasoned explanation and make a finding on whether the approval of the Smog Check Contingency Measure SIP with respect to the 1997 ozone NAAQS constitutes illegal backsliding.

*Response to Comment A–3:* In relevant part, CAA section 110(l) prohibits EPA approval of a SIP revision that would interfere with any applicable requirement concerning attainment and reasonable further progress (RFP) or any other applicable requirement of the CAA. The Smog Check Contingency Measure SIP is a SIP revision, and thus, CAA section 110(l) governs the EPA's review of the submission.

The SIP revision that is the subject of this rulemaking (the Smog Check Contingency Measure SIP) relates to the contingency measure requirements for nonattainment areas under the CAA. Because, by design, contingency measures are adopted to achieve emissions reductions beyond those needed by an area to demonstrate RFP and attainment, contingency measures by their nature do not interfere with attainment and RFP. In this instance, the EPA approved the contingency measure (*i.e.,* the Smog Check Contingency Measure) that is included in the Smog Check Contingency Measure SIP in a separate action. In that separate action, the EPA found that the Smog Check Contingency Measure would provide emissions reductions that are surplus to those that are needed for other CAA purposes or that are relied upon for RFP or attainment.[22]

CAA section 110(l) also prohibits approval of SIP revisions that interfere with "any other applicable requirement" of the CAA. The only other "applicable requirement" of the CAA that applies in this instance is the attainment-related contingency measure requirement under CAA section 172(c)(9). For the reasons provided by the EPA in our proposed rule and in the responses to comment provided herein, we conclude that the Smog Check Contingency Measure SIP meets the attainment-related contingency measure requirements under CAA section 172(c)(9) for the San Joaquin Valley for

---

[19] For instance, if a state chose to meet the contingency measure requirement equally (on a percentage basis) using both $NO_X$ and VOC contingency measures, the OYW of RFP metric would be 8.5 tpd of $NO_X$ and 6.9 tpd of VOC.

[20] CAA section 172(e) provides: "If the [EPA] relaxes a [NAAQS] after November 15, 1990, the [EPA] shall, within 12 months after the relaxation, promulgate requirements applicable to all areas which have not attained that standard as of the date of such relaxation. Such requirements shall provide for controls which are not less stringent than the controls applicable to areas designated nonattainment before such relaxation." The EPA's anti-backsliding regulation for the revoked 1997 ozone NAAQS is found at 40 CFR 51.1105.

[21] 40 CFR 51.1105(a)(1) and 40 CFR 51.1100(o)(13).

[22] 88 FR 87981, at 87985 (December 20, 2023); finalized at 89 FR 56222 (July 9, 2024).

**Federal Register** / Vol. 91, No. 55 / Monday, March 23, 2026 / Rules and Regulations **13751**

the 1997 ozone NAAQS. Based on our conclusion that the Smog Check Contingency Measure SIP meets the only other "applicable requirement" of the Act, we find that our approval would not interfere with any other applicable requirement of the Act, consistent with the provisions of CAA section 110(l).

Lastly, the EPA-approved SIP includes a commitment by CARB to develop, adopt and submit by 2020 attainment contingency measures meeting the requirements of CAA section 172(c)(9), pursuant to CAA section 182(e)(5), for the San Joaquin Valley for the 1997 ozone NAAQS. The EPA-approved commitment does not specify an amount of emissions reductions that the attainment contingency measures must achieve but only specifies that the attainment contingency measures must meet the requirements of CAA section 172(c)(9). Thus, our approval of the Smog Check Contingency Measure SIP does not weaken the amount of reductions required for contingency measures under the SIP, as the commenter suggests, because the SIP does not also specify an amount.

*Comment A–4:* Valley Air Advocates assert that EPA's proposed approval of the Smog Check Contingency Measure SIP based on OYW of progress, as opposed to OYW of RFP, violates CAA section 172(c)(9). Valley Air Advocates cite the language of the provision, the legislative history, and the statutory scheme to support an interpretation that the CAA section 172(c)(9) requires contingency measures to achieve OYW of RFP. As for the language of CAA section 172(c)(9), Valley Air Advocates note that while the contingency measure requirement applies to both failures to make RFP and failures to attain the NAAQS by the applicable attainment date, only the reference to RFP suggests a specific quantity of emissions to be reduced. Valley Air Advocates also cite the Ninth Circuit's decision in *Association of Irritated Residents* v. *EPA* [23] as support for the interpretation that CAA section 172(c)(9) requires contingency measures that provide for OYW of RFP. Lastly, Valley Air Advocates state that the OYW of RFP approach is more consistent with the CAA's scheme of imposing more stringent requirements for ozone nonattainment areas based on attainment status (*i.e.,* an Extreme area has more stringent requirements than a Serious area, which likewise has more

stringent requirements than a Moderate area) than the OYW of progress approach.

*Response to Comment A–4:* Regarding emissions reduction metrics (*i.e.,* the recommended amount of emissions reductions that contingency measures should achieve), we disagree with commenters as to what is required under the CAA and with the commenters' broader framing of contingency measures within the overall planning requirements for nonattainment areas. While there is a statutory link between RFP and the contingency measure requirements of CAA section 172(c)(9), it does not function as the commenter suggests (*i.e.,* to establish an amount of emissions reductions that contingency measures should achieve).

CAA section 172(c)(9) ("Contingency measures") requires the state to adopt SIP revisions for nonattainment areas that provide for the implementation of specific measures to be undertaken if the area fails to make reasonable further progress, or to attain the national primary ambient air quality standard by the attainment date. Section 172(c)(9) also specifies that such measures must be included in the SIP revision as contingency measures to take effect in any such case without further action by the state or the EPA.

Thus, while section 172(c)(9) requires contingency measures where an area fails to make RFP, the language does not specify what amount of emissions reductions such measures should achieve (*i.e.,* does not explicitly tie the amount of reductions to RFP). Moreover, the statutory text also has a link to attainment, but it too does not specify what amount of emissions reductions contingency measures should achieve.

While Congress did not specify an amount that contingency measures must achieve to comply with CAA section 172(c)(9), Congress must have intended the amount to be material because, without a specified amount, a state would not know how to comply with the requirement. Thus, Congress must have at least implicitly delegated to the EPA the authority to determine an amount of emissions reductions that contingency measures should achieve and thereby give meaning to the requirement and provide states with a basis to comply with CAA section 172(c)(9) for a given nonattainment area.

The EPA has taken a policy approach to this question, and in the past, the EPA has indicated that the recommended amount is OYW of RFP but allowed states to provide a reasoned justification for adopting contingency

measures that would provide less than the recommended amount. Under the Revised Contingency Measure Guidance, the EPA is continuing to take a policy approach but is recommending OYW of progress and describing a specific analytical framework that states may use to develop a reasoned justification in the form of an infeasibility demonstration if the state is unable to identify and adopt contingency measures that can achieve the recommended amount of emissions reductions.[24]

In support of our revised approach, we first note that, for both RFP and attainment purposes, contingency measures are intended to provide for continued progress in the event that an area fails to meet an RFP milestone or fails to attain the NAAQS by the applicable attainment date. They are not themselves expected to provide for either RFP or attainment. With respect to RFP, the CAA provides certain remedies if the contingency measures do not make up the shortfall for a given RFP milestone.[25] With respect to a failure to attain by the applicable attainment date, the CAA too provides a remedy by requiring a new attainment plan.[26]

In reviewing our long-standing approach to contingency measures, the EPA observed that basing the amount of emissions reductions on the annual amount of reductions needed to meet the separate RFP requirement—OYW of RFP—may in some cases lead to an amount that is greater than what typically would be needed to make up for a shortfall in RFP or for attainment purposes.[27] The OYW of RFP approach was unnecessarily conservative for estimating the amount of emissions reductions needed for contingency measure purposes because a given percentage of the base year inventory tends to represent a much more

---

[23] *Association of Irritated Residents* v. *EPA,* 10 F.4th 937 (9th Cir., 2021) ("*Association of Irritated Residents* v. *EPA*").

[24] OYW of RFP is calculated differently for ozone and particular matter (PM). For ozone, annual RFP is essentially defined as three percent of the base year emissions inventory (EI). For PM, annual RFP is the average annual reductions between the base year EI and the projected attainment year EI (*i.e.,* the projected attainment inventory for the nonattainment area). In contrast, OYW of progress is calculated the same way for ozone and PM: by determining the average annual reductions between the base year EI and the projected attainment year EI, determining what percentage of the base year EI this amount represents, then applying that percentage to the projected attainment year EI to determine the amount of reductions needed to ensure ongoing progress if contingency measures are triggered. See also the EPA's Final Revised Contingency Measure Guidance, pp. 23–27.

[25] See CAA sections 182(g)(3) and 189(c)(3).

[26] See CAA section 179(d).

[27] EPA's Final Revised Contingency Measure Guidance, pp. 23–27.

significant portion of the attainment projected inventory.

In shifting to the OYW of progress approach, the EPA recognizes attainment of the NAAQS as the primary objective of the nonattainment plan requirements, and thus the appropriate metric should be attainment-focused. In the absence of a CAA-specified amount of emissions reductions required for contingency measures, the EPA's new approach is a better reading of the contingency measure SIP requirement given our understanding of the statutory purpose of contingency measures following a failure to attain or to make RFP, which is to ensure uninterrupted progress toward attainment while the next steps unfold in response to the failure. In addition, for ozone, the recommended percentage of reductions represents appropriate progress toward attainment as opposed to a fixed amount. The annual rate of reductions (*i.e.,* the percentage) could be more or less than three percent, depending on the amount of reductions necessary to demonstrate attainment, and states should perform this calculation for both ozone precursors, VOC and $NO_X$.

Moreover, unlike the previous approach, the EPA's new approach takes into account the declining emissions inventories between the base year and attainment year for a given nonattainment area and aligns the metric for determining the amount of emissions reductions that contingency measures should achieve for ozone and particulate matter (PM). The alignment between ozone and PM is a better reading of the statute considering that the relevant statutory provision, CAA section 172(c)(9), applies to all the NAAQS.

As to the specific SIP submission addressed in this document, we acknowledge that CARB used the newly-recommended metric in preparing the Smog Check Contingency Measure SIP for which the EPA is now finalizing approval but, in this instance, the SIP submission and the EPA's evaluation thereof would have been the same in substance if the previous metric (*i.e.,* OYW of RFP) had been used instead. This is because, using either metric, the SIP submission relies on a contingency measure that provides for less than OYW of progress or RFP for both ozone precursors. The only difference is the extent to which the emissions reductions from the contingency measure fall short of each metric.

Using either metric, the EPA would have expected the State to provide a reasoned justification for not adopting contingency measures sufficient to achieve greater VOC and $NO_X$ emissions reductions. Consistent with the EPA's recommendations in the Revised Contingency Measure Guidance, California did so in this case in the form of infeasibility demonstrations in the Smog Check Contingency Measure SIP and the 2024 SJV Ozone Contingency Measure Plan.

Second, the commenters are incorrect by stating that only the reference to RFP in CAA section 172(c)(9) suggests a specific amount of emissions reductions. RFP and attainment both suggest a specific quantity of emissions reductions. For ozone, the emissions reductions required for RFP are generally three percent of baseline VOC emissions each year (averaged over a three-year period). Emissions reductions needed for attainment are the emissions from the attainment year inventory subtracted from the base year emissions inventory and then divided by the number of years between the attainment year and the base year.

Third, Valley Air Advocates assert that the decision in the *Association of Irritated Residents* v. *EPA* case highlights and connects to the statutory link between contingency measures and RFP. The *Association of Irritated Residents* v. *EPA* decision supports the proposition that surplus emissions reductions from already-implemented measures cannot be relied upon as a justification for adoption of contingency measures that provide for less than the recommended amount of emissions reductions for such measures. However, the decision does not bear on the question of the amount of emissions reductions that contingency measures should achieve or the consideration of feasibility of additional measures as justification for not adopting contingency measures sufficient to achieve the recommended amount of such measures.

The rationale for our approval of the Smog Check Contingency Measure Plan SIP for the 1997 ozone NAAQS is not the same as the rationale for our approval, later withdrawn in response to the *Association of Irritated Residents* v. *EPA* decision, of the contingency measure element for San Joaquin Valley for the 2008 ozone NAAQS that was at issue in this case. In the case of the contingency measure element for the 2008 ozone NAAQS, the EPA took into account the surplus emissions reductions from already-implemented measures in the milestone years and the years following the attainment date, not as constituting contingency measures per se, but rather as justification for approving a contingency measure

element that included a single contingency measure that would provide for far less than the recommended amount.

The Court found that, by doing so, the EPA had "severed the relationship between the requirement of contingency measures and the benchmark of reasonable further progress, without an adequate explanation of why the new— and far more modest—contingency measure is reasonable." [28] The Court did not indicate that the Agency could not depart from previous guidance but cautioned that the EPA "must give a reasoned explanation for departing from agency practice or policy." [29] The Court concluded that "[I]f already-implemented measures cannot themselves be contingency measures— and Bahr makes clear that they cannot— then neither can they be a basis for declining to establish contingency measures that would otherwise be appropriate." [30] The Court rejected the EPA's rationale for allowing consideration of surplus emissions reductions from already-implemented measures, reasoning that the EPA could not approve a contingency measure element "lacking robust contingency measures by assuming that they will not be needed. Because the agency did not provide a reasoned explanation for approving the state plan, the rule is arbitrary and capricious." [31]

In the wake of the *Association of Irritated Residents* v. *EPA* decision, and other case law interpreting the contingency measure SIP requirement, the EPA undertook an internal process to reconsider previous guidance provided by the Agency to states for preparation of SIP submissions to meet the contingency measure requirements—a process that led to the publication of the Revised Contingency Measure Guidance. Among other things, in the Revised Contingency Measure Guidance, the EPA explains why the Agency believes that it is appropriate to update its prior guidance with respect to the recommended amount of emissions reductions that contingency measures should achieve and the considerations that states could use to justify adoption of contingency measures that do not provide for the recommended amount of emissions reductions.[32] We found that

---

[28] *Association of Irritated Residents* v. *EPA,* 10 F.4th 937, 946 (9th Cir. 2021).

[29] Id.

[30] Id.

[31] Id. at 947.

[32] EPA's Revised Contingency Measure Guidance, pp. 23–33 (revised metric) and pp. 33–45 (reasoned justification for adoption of contingency measures that provide for less than the recommended amount of emissions reductions).

an update to our contingency measures guidance was justified in light of changed factual circumstances and a current understanding of what remaining controls may be available for states to adopt as contingency measures.

Lastly, we have reviewed the commenter's hypothetical scenario purportedly illustrating a fatal flaw in the OYW of progress metric and disagree that it shows that the OYW of progress metric runs contrary to the structure of the CAA. The scenario compares three ozone areas: one is a Serious nonattainment area, one is a Severe nonattainment area, and one is an Extreme ozone nonattainment area. All three areas have base year emissions of 200 tpd and require emissions reductions of 100 tpd to attain the ozone NAAQS. The Serious area has a maximum of 9 years to attain, the Severe area has a maximum of 15 years to attain, and the Extreme area has a maximum of 20 years to attain. In this scenario, the commenter estimates OYW of progress would be 5.7 tpd for the Serious area, 3.3 tpd for the Severe area, and 2.5 tpd for the Extreme area and asserts that the structure of the CAA would suggest that the Extreme area should be subject to a greater burden to achieve emissions reductions as compared to the Severe area, which in turn should be subject to a greater burden that the Serious area, not lesser burdens.

Under this scenario, we must assume that the nine years, 15 years, and 20 years represents "expeditious attainment" for the Serious, Severe and Extreme area, respectively. Therefore, the Serious area has identified control measures sufficient to achieve approximately 11.1 tpd reduction on an annual basis over the nine-year period from the base year to the attainment year. In contrast, the Severe and Extreme areas have identified control measures sufficient to achieve approximately 6.7 tpd and 5 tpd reduction, respectively, on an annual basis over the 15-year period (for the Severe area) or 20-year period (for the Extreme area).

This suggests that the Serious area has a greater number of feasible control measures available to adopt and, in the event of a failure to attain, that a higher burden to continue that rate of progress after the attainment year is appropriate. Conversely, the Severe and Extreme areas would appear to have fewer feasible options available and, in the event of a failure to attain, that a lower burden (compared to the Serious area) to maintain the lower rate of progress after the attainment year is also appropriate. For these reasons, we do

not agree that the scenario provided by the commenter shows that our revised interpretation, as set forth in the Revised Contingency Measure Guidance, of the amount of emissions reductions that states should achieve to meet the CAA's contingency measure SIP requirement runs contrary to the general remedial scheme of the CAA that imposes more stringent requirements on higher classified areas.

*Comment A–5:* Valley Air Advocates state that the EPA does not have authority under the CAA to exempt California from adopting additional contingency measures, other than the Smog Check Contingency Measure, based on an infeasibility demonstration. Section 172(c)(9) does not include an exemption for measures deemed infeasible. Valley Air Advocates also state that the EPA's argument that the CAA includes provisions in other sections to allow air agencies to exclude control measures that are infeasible does not support its interpretation of the use of an infeasibility justification for contingency measures; rather, the inclusion of language related to feasibility in other CAA provisions but not in section 172(c)(9) suggests the omission by Congress of a feasibility standard with regard to contingency measures was intentional.

*Response to Comment A–5:* As discussed in Response to Comment A–4, Congress must have at least implicitly delegated to the EPA the authority to determine an amount of emissions reductions that contingency measures should achieve and thereby give meaning to the requirement and provide states with a basis to comply with CAA section 172(c)(9) for a given nonattainment area. The EPA is continuing to take a policy approach to this question and is recommending OYW of progress and describing a specific analytical framework that states may use to develop a reasoned justification if the state is unable to identify and adopt contingency measures that can achieve the recommended amount of emissions reductions. More specifically, as stated in our proposed rule and the EPA's Revised Contingency Measures Guidance, where a state is unable to identify contingency measures that would provide emissions reductions approximately equal to OYW of progress, the state should provide a reasoned justification in the form of an infeasibility demonstration that explains and documents how it has evaluated all existing and potential control measures relevant to the appropriate source categories and pollutants in the nonattainment area and has reached

reasonable conclusions regarding whether such measures are feasible. Thus, while the EPA acknowledges that CAA section 172(c)(9) does not explicitly provide for consideration of whether specific measures are feasible, the EPA does not read the statute to require air agencies to adopt and impose infeasible measures.

As stated in the proposed rule, the statutory provisions applicable to other nonattainment area plan control measure requirements, including reasonably available control measures/ reasonably available control technology (RACM/RACT), best available control measures/best available control technology (BACM/BACT), and most stringent measures (MSM), allow air agencies to exclude certain control measures that are deemed unreasonable or infeasible (depending on the requirement). For example, the MSM provision in CAA section 188(e) requires plans to include "the most stringent measures that are included in the implementation plan of any state or are achieved in practice in any state, and can feasibly be implemented in the area." While the contingency measures provisions do not include such caveats, the EPA does not conclude that the contingency measures provisions should be read to require plans to include infeasible measures. Thus, the EPA anticipates that a demonstrated lack of feasible measures would be a reasoned justification for adopting contingency measures that achieve less than the recommended amount of emissions reductions.[33]

*Comment A–6:* Valley Air Advocates assert that, even if CAA section 172(c)(9) did allow the EPA to exempt states from contingency measures it deems infeasible, there is not an objective standard or criteria for such a

---

[33] Moreover, we note that contingency measures under CAA section 172(c)(9), once triggered, are generally permanent and become one of the baseline control measures for the next milestone demonstration or the new attainment plan that must be adopted and submitted by the state for an area that has failed to attain the NAAQS by the applicable attainment date. As noted in this document, technological and economic feasibility is a hallmark of such control measures. In contrast, CAA section 110(a)(2)(G) requires states to adopt and submit contingency plans to address emergency episodes as part of their SIPs, and the contingency plans for emergency episodes identify emission control actions to be taken at different episode levels, which are much higher than the NAAQS, without consideration of economic or technological feasibility. See, generally, 40 CFR 51.150–51.152 and appendix L to 40 CFR part 51. One significant difference, however, between the emission control actions for emergency episode plans under CAA section 110(a)(2)(G) and the control measures relied upon for RFP and attainment is that the former are temporary and are implemented only while the emergency episode persists whereas the latter are, as noted, permanent controls for the area.

feasibility determination. The Revised Contingency Measure Guidance does not provide such objective standards, meaning that any determinations EPA makes as to feasibility or infeasibility are inherently arbitrary.

*Response to Comment A–6:* The Revised Contingency Measure Guidance provides states with a recommended approach for identifying potential contingency measures and, if there are an insufficient number of feasible contingency measures to achieve OYW of progress, for documenting the basis for that conclusion via an infeasibility demonstration. The criteria include economic and technological feasibility as well as timing considerations. Contingency measures are expected to achieve emissions reductions within a year or two of the triggering event to qualify as contingency measures.

The EPA evaluates state SIP submissions for other CAA requirements, including RACM/RACT, BACM/BACT, and MSM, on the same basis (economic and technological feasibility) that we are employing to evaluate SIP submissions for contingency measures. By their nature, judgements made based on economic and technological feasibility are fact-specific, but that does not make them arbitrary.

*Comment A–7:* Valley Air Advocates comment that the EPA has contradicted itself by finding that the contingency measures that the EPA has approved and the contingency measures to which CARB and the District committed are ''the entire set of feasible contingency measures for ozone precursor emissions in the San Joaquin Valley.'' [34] The commenter states that this is inconsistent with the EPA's action approving a contingency measure with just one trigger for three $PM_{2.5}$ standards, because that approval relied upon a rationale that the state would adopt and submit additional contingency measures should a triggering event occur.[35] The commenter states that EPA has not provided an adequate explanation of why the state would be able to develop and submit additional contingency measures for $PM_{2.5}$ and not for the 1997 ozone NAAQS.

*Response to Comment A–7:* Ozone and $PM_{2.5}$ are different criteria air pollutants for which the EPA has established NAAQS. Within the San Joaquin Valley, the relevant pollutants and plan precursors are direct $PM_{2.5}$ and $NO_X$ for the purpose of meeting CAA SIP requirements for the $PM_{2.5}$ NAAQS.

For ozone, the precursors are $NO_X$ and VOC. $NO_X$ is a precursor to both $PM_{2.5}$ and ozone for the purpose of meeting CAA requirements in the San Joaquin Valley.

Direct $PM_{2.5}$ emissions are not relevant for ozone SIP planning purposes. Thus, there is no contradiction by the EPA where the Agency states that State and District have adopted (or committed to adopt) the entire set of feasible contingency measures for ozone precursors and that, upon triggering of the $PM_{2.5}$ contingency measures, we expect that CARB and the District would adopt and submit a SIP revision to demonstrate that the SIP continues to meet $PM_{2.5}$ contingency measure requirements. In so doing, we expect CARB and the District to update their previous evaluations of direct $PM_{2.5}$ source categories to identify potential contingency measures and to adopt such measures that are economically and technologically feasible and that can achieve meaningful emissions reductions within a year or two of a future $PM_{2.5}$-related triggering event.

With respect to $NO_X$, the finding with respect to the 1997 ozone NAAQS that State and District have adopted (or committed to adopt) the entire set of feasible contingency measures for ozone precursors (VOC and $NO_X$) is keyed to a moment in time. With the passage of time, new information and analyses can be used to identify potential contingency measures that have not been identified to date and that warrant evaluation for economic and technological feasibility as well as the potential to achieve meaningful $NO_X$ emissions reductions within a year or two of a future triggering event.

*Comment A–8:* Valley Air Advocates assert that the Smog Check Contingency Measure provides only *de minimis* emissions reductions and that compliance with CAA section 172(c)(9) requires more than a *de minimis* amount of reductions from contingency measures. Citing the decision in *Committee for a Better Arvin,*[36] the commenter notes that the Ninth Circuit upheld the EPA's assertion that certain California rules for the 1997 $PM_{2.5}$ annual NAAQS did not need to be approved into the SIP because the rules achieved only *de minimis* reductions and that the reductions deemed by the EPA to be *de minimis* for the 1997 $PM_{2.5}$ NAAQS are greater than those from the Smog Check Contingency Measure. As such, the commenter asserts that the EPA cannot dispute that the Smog

Check Contingency Measure provides *de minimis* emissions reductions and simply does not fulfill the requirement under CAA section 172(c)(9) to adopt contingency measures.

*Response to Comment A–8:* The EPA does not agree that the emissions reductions from the Smog Check Contingency Measure are *de minimis.* Characterizing an amount as *de minimis* cannot be severed from its context. In the case of the emissions reductions (amounting to 0.62 tpd of $NO_X$) that the EPA characterized as *de minimis* in connection with the Agency's approval of the San Joaquin Valley attainment plan for the 1997 $PM_{2.5}$ NAAQS, and that are cited in the *Committee for a Better Arvin* decision, the context was the overall amount of emissions reductions from the base year needed to demonstrate attainment of the 1997 $PM_{2.5}$ NAAQS by the applicable attainment date. The relevant amount of $NO_X$ emissions reductions needed for attainment was 284.2 tpd,[37] and the emissions reductions from the rules at issue (0.62 tpd) represented only 0.2 percent of the overall reduction amount.

With respect to our evaluation of the Smog Check Contingency Measure, the context is the EPA's recommended amount of emissions reductions that contingency measures should achieve (*i.e.,* OYW of progress). The estimated reductions from the Smog Check Contingency Measure (0.112 tpd of $NO_X$) amount to 2.2 percent of OYW of progress, an order of magnitude greater than the corresponding percentage cited in the previous paragraph in relation to the attainment needs of the area.

We do however find that the emissions reductions from the Smog Check Contingency Measure, which CARB estimates to be 0.112 tpd and 0.056 tpd of $NO_X$ and VOC, respectively, represent only about one or two percent of OYW of progress. Because the estimate reductions are well below the recommended metric (*i.e.,* OYW of progress), CARB and the District are not relying solely on the Smog Check Contingency Measure to demonstrate compliance with the contingency measure requirements of CAA section 172(c)(9) for the San Joaquin Valley for the 1997 ozone NAAQS. Rather, CARB and the District are relying on their infeasibility demonstrations that document their evaluation for potential additional contingency measures and the rationale for their conclusions that there are no

---

[34] 90 FR 51029 (November 14, 2025).
[35] 89 FR 80749 (October 4, 2024).

[36] *Committee for a Better Arvin* v. *EPA,* 786 F.3d 1169 (9th Cir. 2015).

[37] 76 FR 41338, at 41354 (July 13, 2011) (proposed partial approval and partial disapproval of the attainment plan and related SIP elements for the 1997 $PM_{2.5}$ NAAQS in the San Joaquin Valley).

additional feasible contingency measures for the area for the 1997 ozone NAAQS.

Likewise, in approving the Smog Check Contingency Measure SIP as meeting the applicable requirements for the San Joaquin Valley for the 1997 ozone NAAQS, we are not solely relying on the Smog Check Contingency Measure but also on our evaluation of the submitted infeasibility demonstrations.

*Comment A–9:* Valley Air Advocates comment that, even if the EPA may lawfully excuse a state from adopting contingency measures based on an infeasibility demonstration, the state did not submit an infeasibility demonstration for stationary and area sources for the 1997 ozone NAAQS. Instead, the EPA accepted the state's request to rely upon the infeasibility demonstration submitted for the 2008 and 2015 ozone NAAQS, without any additional analysis. The commenter further points to EPA's Revised Contingency Measure Guidance, which indicates that, for infeasibility demonstrations, ''lower amounts of CM emissions reductions will warrant more robust analyses demonstrating a thorough effort to identify candidate measures and to document the infeasibility of candidate measures,'' [38] and that, in the case of the 1997 ozone NAAQS, with fewer reductions from contingency measures compared to those for the 2008 ozone contingency measures requirement, the EPA accepted an infeasibility demonstration that was clearly not more robust than that accepted for the 2008 ozone NAAQS.

*Response to Comment A–9:* In our proposed rule, we explained why we found that reliance on the infeasibility demonstrations included in the 2024 SJV Ozone Contingency Measure Plan is appropriate even though it was not developed or submitted to address the contingency measure requirement for the 1997 ozone NAAQS for two reasons. First, the control strategies for all three ozone NAAQS (the 1997 ozone NAAQS, the 2008 ozone NAAQS, and the 2015 ozone NAAQS) relate to the same averaging period (8-hour average), the same precursor emissions ($NO_X$ and VOC) and the same emissions sources, the same planning emissions inventories (summertime average day), and the same types of control measures. Second, CARB and the District recommended that the EPA take into consideration the 2024 SJV Ozone Contingency Measure Plan during its review of the Smog Check Contingency

Measure SIP for compliance with the attainment-related contingency measure requirements for the 1997 ozone NAAQS.[39]

The commenter is correct that, in the Revised Contingency Measure Guidance, the EPA states that a lower amount of emissions reductions from contingency measures relative to OYW of progress warrants more robust analyses demonstrating a thorough effort to identify candidate contingency measures and to document the infeasibility of such measures. The commenter is also correct that the emissions reductions for the 1997 ozone NAAQS are lower than those for the 2008 and 2015 ozone NAAQS and yet all three ozone NAAQS rely on the same set of analyses to justify adoption of contingency measures that provide for less than OYW of progress.

For these reasons, the EPA would normally have expected the State to conduct updated analyses to identify candidate measures for, in this case, the 1997 ozone NAAQS, but the Smog Check Contingency Measure SIP (for the 1997 ozone NAAQS) and the 2024 SJV Ozone Contingency Measure Plan (for the 2008 and 2015 ozone NAAQS) were submitted within a short period of one another. CARB submitted the Smog Check Contingency Measure SIP on November 13, 2023, and the 2024 SJV Ozone Contingency Measure Plan on April 29, 2024.

The more recently-submitted SIP provides the missing pieces of the earlier submission by including a comprehensive review of stationary and area source categories for candidate contingency measures. Because of the proximity in time of the two SIP submissions, the Smog Check Contingency Measure SIP and the 2024 SJV Ozone Contingency Measure Plan can be considered collectively, and together, they constitute a comprehensive review of stationary, area, and mobile source categories for candidate ozone contingency measures in the San Joaquin Valley for all three ozone NAAQS.

The review of stationary and area source categories in the 2024 SJV Ozone Contingency Measure Plan revealed certain additional feasible ozone contingency measures that the District has committed to adopt. The District has chosen to adopt these additional contingency measures for the 2008 and

2015 ozone NAAQS and not to adopt them for the 1997 ozone NAAQS. The District is not required to extend the applicability of these additional contingency measures to a third ozone NAAQS (*i.e.,* the 1997 ozone NAAQS).

*Comment A–10:* Valley Air Advocates assert that, even if the EPA may lawfully excuse a state from contingency measures based on an infeasibility demonstration, the infeasibility demonstration for confined animal facilities (CAFs) is inadequate. It relies on statements from the District that Rule 4570, which covers CAFs in the Valley, is the most stringent rule for this source category compared to other air districts. Such a rationale is not a feasibility analysis, as it does not answer the question of whether the current rule, which is menu-based, allowing CAF operators to choose from among a menu of control options, could feasibly be made more stringent as a contingency measure by requiring operators to implement additional menu options. Additionally, the commenter states that the 2010 amendments to Rule 4570 retired most of the Class Two Mitigation Measures on grounds that they were infeasible. The infeasibility demonstration for contingency measures submitted as part of the 2024 SJV Ozone Contingency Measure Plan does not address whether this set of mitigation measures could be feasible as contingency measures.

*Response to Comment A–10:* In response to comments received on our proposed rule, we requested that CARB and the District clarify the basis for the conclusion that there are no feasible contingency measures for CAFs. CARB and the District responded with additional analyses to clarify and supplement their feasibility analysis for the CAF source category.[40] We have reviewed the supplemental information provided by CARB and the District and find that it affirms our preliminary finding from the proposed rule that CARB and the District have demonstrated that contingency measures for this source category are infeasible at this time.

In the Confined Animal Facilities Supplement, the District first discusses Rule 4570's menu-based approach, where CAF operators must select from a limited menu of mitigation measures.

---

[38] Revised Contingency Measure Guidance, at 37.

[39] See letter from Ariel Fideldy, Chief, CARB Air Quality Planning Branch to Michelle Angelich, Acting Director, EPA Region IX Air and Radiation Division, dated October 16, 2025, and letter from Sheraz Gill, Deputy Air Pollution Control Officer, SJVUPACD to Edie Chang, Deputy Executive Officer, CARB, dated October 10, 2025.

[40] Letter dated January 30, 2026, from Matthew Lakin, Chief, Air Quality Planning and Science Division, CARB, to Anita Lee, Acting Director, Air & Radiation Divison, EPA Region IX, with the following attachment: ''Technical Clarification and Additional Information for the 1997, 2008, and 2015 8-Hour Ozone NAAQS Contingency Measures'' (herein, ''Confined Animal Facilities Supplement'').

The District contends that the menu-based approach is necessary because CAFs in the San Joaquin Valley vary significantly compared to traditional industrial sources.[41] As a result, it is not feasible for all operators to implement identical mitigation measures given the differences in infrastructure, climate, permitting requirements, water availability and water board regulations, production contracts, and other limitations. Furthermore, the District reasons that requiring all measures from the menu would be duplicative and would not result in additional emissions reductions, as the measures control emissions through the same mechanisms. The EPA concurs with the District's menu-based approach for this source category and agrees that requiring implementation of additional mitigation measures from the menu in Rule 4570 as a contingency measure would be duplicative and would not result in increased emissions reductions.

The District then discusses the feasibility of Class Two Mitigation Measures from the pre-2010 version of Rule 4570 as contingency measures. The District explains that Class Two mitigation measures referred to practices that could potentially achieve emissions reductions equal to or greater than those achieved by Class One mitigation measures and were originally included in Rule 4570 to encourage CAF operators to go beyond the basic rule requirements and implement innovative practices to further reduce emissions.[42] However, the District notes that many of the Class Two Mitigation Measures were theoretical measures that had not been demonstrated in practice at CAFs. The District points to its previous evaluation of these Class Two Mitigation Measures in its ''2010 Final Staff Report for the Revised Proposed Amendments to Rule 4570,'' [43] where the Class Two Mitigation Measures were found to be technologically or economically infeasible and subsequently removed from Rule 4570. The District highlights the specific example of venting silage to a control device as a Class Two Mitigation Measure found to be infeasible and explains that it is infeasible because active venting introduces air into the silage, whereas

silage preservation requires anaerobic conditions.[44]

The next step in the District's analysis was to evaluate the feasibility of adopting certain specific additional mitigation measures as contingency measures in Rule 4570. The District evaluated mitigation measure categories applicable to the San Joaquin Valley, including litter amendments and additives, biofilters, wet scrubbers, anaerobic digestion, injection of liquid and slurry manure, reducing crude protein for beef cattle, reducing crude protein content for dairy cattle, and increased grazing time for dairy cattle. For each mitigation measure, the District evaluated the technological and economic feasibility to determine whether the measure would be feasible for adoption as a contingency measure.[45]

With respect to litter amendments and manure additives, the District separately analyzed acidifying amendments and additives for poultry litter, manure additives, and microbial additives.[46] With respect to acidifying amendments and additives for poultry litter, the District notes that emissions reductions from acidifying amendments and additives for poultry litter have not been quantified in regard to VOC. Furthermore, the District contends that many additives to litter and manure require approval from the CA Regional Water Quality Control Board (RWQCB), may not be allowed, or may be toxic to handle.[47] The District then performed an economic analysis of using aluminum sulfate, commonly referred to as ''alum,'' as an additive to reduce VOC from poultry litter. Based on this analysis, the District concludes that it is not viable to adopt the measure as a contingency requirement to reduce VOC emissions. For manure additives for liquid and slurry manure, the District states that the measure is infeasible due to pH, hydrogen sulfide emissions, and salinity concerns. The District contends that microbial additives are not feasible or practical for operations in the Valley. Citing a study by the National Hog Farmer,[48] the District contends that the effectiveness of microbial manure

additives for VOC emissions reduction remains unproven.[49]

When a biofilter is used, exhaust air containing pollutants passes through media that contain an established, diverse population of aerobic microorganisms that oxidize organic contaminants, ammonia, and sulfur compounds. Biofilters have been successfully used to control odors and emissions from industrial sources, and the ''Agricultural Air Quality Conservation Measures, Reference Guide for Poultry and Livestock Systems'' (''USDA Reference Guide'') identifies biofilters as a potential method to control VOC emissions at CAFs.[50] However, the USDA Reference Guide also notes several considerations that must be taken into account when using biofilters to control emissions from CAFs, including the substantial costs involved. The District has evaluated the potential for greater use of biofilters to reduce VOC emissions from CAFs but finds that using biofilters to treat all the exhaust air from CAFs in the San Joaquin Valley is impractical due to the size of the biofilters that would be needed, the energy required to overcome the airflow resistance they create, and the airflow required to cool the enclosed spaces effectively.[51] The District also notes certain other practical difficulties, particularly in connection with biofilter maintenance. In light of all of these considerations, the District concludes that requiring the installation and use of biofilters as a contingency measure to control VOC emissions at CAFs is not feasible.

Wet scrubbers are capable of reducing particulate matter and gas emissions from animal production houses that are mechanically ventilated by physically trapping the particulate matter on wet surfaces and absorbing gases into a liquid. Many of the same technical difficulties posed by installation and maintenance of biofilters at CAFs also apply to installation and maintenance of wet scrubbers at CAFs. Specifically, the District notes that, similar to biofilters, the practicality of scrubbers is limited as a result of their potential to compromise the ventilation airflow rated needed to control temperature in production houses and ensure animal health.[52] Citing the USDA Reference Guide, the District finds that a high air flow rate in the summer, animal housing differences, ongoing maintenance, and

[41] Confined Animal Facilities Supplement, p. 3.

[42] Confined Animal Facilities Supplement, p. 4.

[43] SJVAPCD. San Joaquin Valley Air Pollution Control District Final Staff Report for the Revised Proposed Amendments to Rule 4570, (October 21, 2010). Retrieved from: *https://ww2.valleyair.org/media/ytbe5gaj/agenda_item_7_oct_21_2010.pdf* and included in the docket for this rulemaking.

[44] Confined Animal Facilities Supplement, p. 5.

[45] Confined Animal Facilities Supplement, pp. 5–22.

[46] Confined Animal Facilities Supplement, pp. 6–11.

[47] Confined Animal Facilities Supplement, pp. 7–8.

[48] National Hog Farmer. Evaluating Manure Additives for Odor Mitigation. (February 2, 2021) Retrieved from: *https://www.nationalhogfarmer.com/manure/evaluating-manure-additives-forodor-mitigation* and included in the docket for this rulemaking.

[49] Confined Animal Facilities Supplement, p. 10.

[50] USDA and EPA, Agricultural Air Quality Conservation Measures Reference Guide for Poultry and Livestock Production Systems. (September 2017).

[51] Confined Animal Facilities Supplement, p. 12.

[52] Confined Animal Facilities Supplement, p. 13.

water demand make this mitigation measure infeasible.[53] Additionally, the District notes that they previously demonstrated the economic infeasibility of using wet scrubbers to control emissions from CAFs in the District's ''Ammonia: Supplemental Information for EPA in Support of 15 μg/m³ annual PM₂.₅ Standard, Appendix B'' (''Ammonia Technical Supplement'').[54]

Anaerobic digesters are systems that break down manure in oxygen-free tanks to produce biogas. In the process of anaerobic digestion, most of the VOC compounds in the substrate are converted to methane, carbon dioxide, and water. The District reports that the California Department of Food and Agriculture (CDFA) has funded the installation of anaerobic digesters at certain dairy CAFs in the Valley. The District notes that a significant obstacle to wider installation and use of anaerobic digesters at CAFs is the high initial and ongoing maintenance costs. The District cites a CDFA reference for the figure of $7.5 million as the average cost for dairy digester projects in California.[55] As such, the District concludes that installation of additional anaerobic digesters in the San Joaquin Valley as a contingency measure is economically infeasible without a stable funding source.[56]

Injection of liquid or slurry manure is generally accepted as a method to reduce emissions relative to traditional surface broadcasting. However, the District notes that nearly all liquid manure in the San Joaquin Valley is already diluted and applied via surface gravity irrigation systems, such as flood and furrow irrigation. The District further notes that this application method reduces emissions because the diluted liquid manure has much lower concentration of VOCs, and liquid manure in furrow and flood irrigation systems emits significantly less VOCs compared to broadcasting.[57] Furthermore, the District contends that no research that has quantified VOC emissions reductions from different methods of land application of manure. Finally, the District notes that to avoid damaging growing crops and to protect water quality, farmers must restrict the frequency, timing, and amount of nitrogen that they can apply to cropland

in certain portions of the San Joaquin Valley.[58] Such restrictions further reduce the potential of injection of liquid or slurry manure for adoption as a contingency measure in the San Joaquin Valley.

Reducing the crude protein content for beef and dairy cattle feed has been evaluated as potential measures to reduce ammonia emissions during certain phases of beef and dairy production, and for that reason, the District has evaluated them as potential contingency measures for VOC. The District notes that the potential VOC reductions from these measures have not been quantified, and achievable reductions are uncertain.[59] For beef cattle, the District notes that reducing the crude protein content of the feed as a means of reducing ammonia has only been tested for the finishing cycle of beef cattle lives, and that there are limited opportunities to implement this measure as there are very few finishing cycle feeder beef cattle in the San Joaquin Valley.[60] Furthermore, the District notes that there may be no net reduction in VOC emissions over the life of the cattle because any VOC reductions from reducing the crude protein content of beef cattle feed may be offset due to the longer time necessary to reach market weight.[61]

For dairy cattle, the District notes significant gaps in knowledge of what would occur if crude protein were reduced in dairy cattle, specifically in the San Joaquin Valley. Higher levels of milk production require higher levels of protein, so reducing the crude protein content of feed will probably reduce milk yields.[62] Citing communications with Dr. Peter Robinson, UC Davis Extension Specialist, Dairy Cattle Nutritional Management Department of Animal Science, the District contends that lowering crude protein below required levels results in an immediate negative impact on milk production.[63] The District reasoned, for both of these measures, it is not feasible to adopt this measure as a contingency requirement, given the remaining uncertainties about VOC emissions reductions, the impacts

on milk production and animal health, and overall costs.[64]

Increasing the amount of time dairy cows spend grazing is considered a potential VOC mitigation measure because it could reduce ammonia emissions due to less silage consumption and may thus also reduce VOC emissions. Based on a number of assumptions for such parameters as the number of acres of pasture required to allow a mature dairy cow to graze per unit of time, the District estimates that 3.1 million acres of irrigated pasture would need to be available for dairy cows in the San Joaquin Valley to graze for the entire year. The land needed is significantly beyond that which is available. For this reason, the District concludes that increased grazing time for daily cattle is not viable to adopt as a contingency requirement to reduce VOC emissions.[65]

In summary, for all mitigation measures evaluated, the District did not identify any new measures capable of achieving VOC emissions reductions that are technologically and economically feasible. Based on our review of the supplemental analysis, we find that the District has evaluated an appropriate set of potential contingency measures for CAFs and presented a reasonable basis to conclude that the measures are not feasible for adoption as contingency measures at this time. Therefore, we continue to agree with the District's conclusion that there are no feasible contingency measures for this source category.

*Comment A–11:* Valley Air Advocates assert that the EPA fails to provide a reasoned explanation when it approves CARB's and the District's infeasibility demonstrations when both overlook operational restrictions on heavy duty diesel trucks as potential contingency measures. For example, Valley Air Advocates suggest that CARB or the District could adopt contingency measures that prohibit operation of certain old and highly polluting diesel trucks in the Valley.

*Response to Comment A–11:* CARB has already adopted control measures intended to reduce NOₓ emissions from in-use heavy-duty diesel trucks. In 2008, CARB adopted the Truck and Bus Regulation[66] and later submitted the regulation, as amended in 2011, to the

---

[53] Confined Animal Facilities Supplement, p. 14.

[54] Ammonia: Supplemental Information for EPA in Support of 15 μg/m3 annual PM₂.₅ Standard, Appendix B. (March 2023). Retrieved from: *https://www.regulations.gov/document/EPA-R09-OAR-2023-0263-0114* and included in the docket for this rulemaking.

[55] Confined Animal Facilities Supplement, p. 15.

[56] Id.

[57] Confined Animal Facilities Supplement, p. 16.

[58] Id.

[59] Confined Animal Facilities Supplement, pp. 18–19.

[60] Confined Animal Facilities Supplement, p. 18.

[61] Journal of Animal Science. Effects of phase-feeding of crude protein on performance, carcass characteristics, serum urea nitrogen concentrations, and manure nitrogen of finishing beef steers (December 1, 2006).

[62] Confined Animal Facilities Supplement, pp. 19–20.

[63] University of California Agriculture and Natural Resources. Ecology and Management of Annual Rangelands Series Part 8: Grazing Management. (December 2020).

[64] Confined Animal Facilities Supplement, p. 20.

[65] Confined Animal Facilities Supplement, 22.

[66] 13 CCR 2025 (''Regulation to Reduce Emissions of Diesel Particulate Matter, Oxides of Nitrogen and Other Criteria Pollutants, from In-Use Heavy-Duty Diesel-Fueled Vehicles'') (''Truck and Bus Regulation'').

EPA for approval as part of the SIP.[67] Under the Truck and Bus Regulation, by January 1, 2023, nearly all trucks and buses were required to have 2010 or newer model-year engines to reduce particulate matter (PM) and $NO_x$ emissions. To help ensure that the benefits of this regulation are achieved, starting in 2020, only vehicles compliant with this regulation will be registered by the California Department of Motor Vehicles (DMV).

More recently, CARB adopted the Heavy-Duty Inspection and Maintenance Regulation [68] that establishes a comprehensive inspection and maintenance program for non-gasoline combustion vehicles above 14,000 gross vehicle weight rating (GVWR) that operate in California. The regulation is intended to ensure that vehicle emissions control systems on these vehicles are operating as designed and repaired quickly.[69]

The emissions reductions from both these regulations are necessary for California to meet CAA requirements to demonstrate RFP and attainment for the various nonattainment areas within the State. Because they were adopted and are being implemented, they were not available to adopt as contingency measures.

*Comment A–12:* Valley Air Advocates assert that the EPA fails to provide a reasoned explanation when it approves CARB's and the District's infeasibility demonstrations when both overlook amendments to increase the stringency of the existing Indirect Source Review (ISR) program as potential contingency measures. In this regard, Valley Air Advocates state the EPA did not discuss or consider whether an ISR-based contingency measure adopted by the District, including amendments to Rule 9510, would be feasible.

*Response to Comment A–12:* Under CAA section 110(a)(5)(A), a state may include in a SIP any ISR program, but the EPA may not require the state to adopt an ISR program as a condition of approval of the SIP. Thus, the District may choose to revise the ISR rule that the District has adopted or adopt an additional ISR rule as a contingency measure, but the EPA cannot require the District to do so even if adopting such

a contingency measure would be feasible and would achieve emissions reductions within two years of the triggering event.

*B. Comments From Central Valley Air Quality Coalition (CVAQ)* [70]

*Comment B–1:* CVAQ notes that the EPA recently found that the San Joaquin Valley failed to attain the 1997 ozone NAAQS by the June 15, 2024 applicable attainment date and that, as a result, the Smog Check Contingency Measure was triggered for the area. CVAQ also states that the associated emissions reductions from the Smog Check Contingency Measure would be "extremely small" and asserts that the CAA requires much more to protect public health. CVAQ notes that the EPA's new interpretation of CAA section 172(c)(9) allows state to claim additional measure to be infeasible, even though the CAA does not provide such an exemption, and urges the EPA to implement the CAA by reinstating the EPA's long-standing interpretation of CAA section 172(c)(9) to require meaningful contingency measures.

*Response to Comment B–1:* We acknowledge that we now recommend a different approach to determining the amount of emissions reductions that contingency measures should provide to meet CAA section 172(c)(9). Under current guidance, we recommend that states adopt contingency measures that would provide OYW of progress rather than OYW of RFP. We also acknowledge that, for San Joaquin Valley for the 1997 ozone NAAQS, OYW of progress is less than OYW of RFP. Nonetheless, under either metric, we would have expected California to submit a reasoned justification to demonstrate compliance with CAA section 172(c)(9) for the San Joaquin Valley for the 1997 ozone NAAQS because the adopted contingency measure would provide less than OYW of progress or OYW of RFP.

California did submit a reasoned justification in the form of infeasibility documentations in the Smog Check Contingency Measure SIP and in the 2024 SJV Ozone Contingency Measure Plan. We reviewed the infeasibility documentations and concluded that California had identified the contingency measures that are technically and economically feasible and that can achieve emissions

reductions within two years of the triggering event. These measures include two adopted measures and commitments for five additional contingency measures for the 2008 ozone 2015 ozone NAAQS. California is not required to also adopt those same measures for the 1997 ozone NAAQS, and California has declined to do so, leaving the Smog Check Contingency Measure as the only contingency measure for San Joaquin Valley for the 1997 ozone NAAQS.[71]

With respect to the allowance for a state to provide a reasoned justification for not adopting contingency measures that achieve OYW of progress (or RFP), we acknowledge in our Revised Contingency Measure Guidance and proposed rule that CAA section 172(c)(9) does not explicitly provide for consideration of whether specific measures are feasible. However, the Agency does not read these statutory provisions to require states to adopt contingency measures that are not feasible. The statutory provisions applicable to other nonattainment area plan control measure requirements, including RACM)/RACT (for ozone and PM), BACM/BACT (for PM), and MSM (for PM), allow air agencies to exclude certain control measures that are deemed unreasonable or infeasible (depending on the requirement). While the contingency measures provisions do not include such caveats, the EPA does not conclude that the contingency measures provisions should be read to require plans to include infeasible measures. Thus, the EPA anticipates that a demonstrated lack of feasible measures would be a reasoned justification for adopting contingency measures that achieve less than the recommended amount of emissions reductions.

Lastly, we note that CARB and the District continue to adopt and implement new control measures that go beyond those that were relied upon in the attainment demonstration for the 1997 ozone NAAQS, such as those that target trucks, consumer products, and agricultural burning for additional reductions, and that will continue to

---

[67] The EPA approved the Truck and Bus Regulation as part of the SIP at 77 FR 20308 (April 4, 2012).

[68] Amended section: 13 CCR 2193; New sections: 13 CCR 2195, 2195.1, 2196, 2196.1, 2196.2, 2196.3, 2196.4, 2196.5, 2196.6, 2196.7, 2196.8, 2197, 2197.1, 2197.2, 2197.3, 2198, 2198.1, 2198.2, 2199, and 2199.1

[69] The EPA approved the Heavy-Duty Inspection and Maintenance Regulation as it pertains to in-state registered vehicles at 91 FR 5325 (February 6, 2026).

[70] Comments were submitted by Central Valley Air Quality Coalition; Center on Race, Poverty, and the Environment; Valley Improvement Projects (VIP); California Environmental Voters; Central California Asthma Collaborative; and the LEAP (Latino Equity, Advocacy & Policy) Institute (collectively referred to herein as "CVAQ").

[71] As the commenter notes, the EPA's determination that the San Joaquin Valley failed to attain the 1997 ozone NAAQS by the June 15, 2024 attainment date triggered the Smog Check Contingency Measure in the San Joaquin Valley. The EPA's determination of failure to attain for the 1997 ozone NAAQS also triggered the requirements of SJVUAPCD Rule 3171 ("Federally Mandated Ozone Nonattainment Fee—1997 8-Hour Standard") that includes a fee collection program. The fees are used to establish and implement surplus incentive-based emissions-reduction programs. The EPA approved SJVUAPCD Rule 3171 at 91 FR 336 (January 6, 2026).

provide for emissions reductions within the San Joaquin Valley into the future.

### C. Comments From California Environmental Voters (CEV)

*Comment C–1:* CEV suggests that there are additional opportunities for reductions from large stationary sources in the Valley, especially stronger leak detection requirements for oil and gas operations, including active idle oil and gas wells, which the commenter states are more likely to leak VOC and other pollutants. They suggest as a contingency measure that there be more frequent inspections, use of optical gas imaging cameras to detect leaks, and a requirement for timely repairs.

*Response to Comment C–1:* The District undertook a review of the source categories that include major stationary sources to identify potential contingency measures for the 2008 and 2015 ozone NAAQS.[72] The District concluded that no feasible contingency measures that could achieve emissions reductions within two years of a triggering event were available for these source categories. As described in section III.B. of the proposed rule, we reviewed the District's evaluation in their infeasibility demonstration and agreed with the District's conclusions.

With respect to oil and gas operations in particular, the District reviewed the agency's rules regulating such operations to identify feasible contingency measures for the 2008 and 2015 ozone NAAQS.[73] As described in the section 5.4 of the 2024 SJV Ozone Contingency Measure Plan, six of the rules were amended in 2023 to tighten VOC requirements. Five of the rules were amended specifically to lower the leak detection and repair limit to 500 parts per million by volume (ppmv) to implement best available retrofit control technology (BARCT) as required under State law.[74] The District evaluated lower leak detection and repair thresholds as part of the rule amendment process and found that the incremental cost effectiveness of lowering the leak detection and repair threshold from 500 ppmv to 100 ppmv would be well over

$300,000 per ton of VOC reduced.[75] On that basis, the District concluded that lowering the leak detection and repair threshold would not be economically feasible to adopt as a contingency measure. We agree with the District's assessment and conclusion in this regard.

In addition, CARB's Oil and Gas Methane Rule applies to those oil and gas sources in the San Joaquin Valley that are not subject to District requirements. CARB undertook a review of the petroleum production and marketing source categories to identify potential contingency measures for the 2008 and 2015 ozone NAAQS.[76] With respect to leak detection and repair (LDAR), CARB notes that, under the Oil and Gas Methane Rule, LDAR is already mandated on a quarterly basis using a very sensitive methodology (U.S. EPA's Method 21) and that the only exemption that results in a significant number of sources not being subject to LDAR is for equipment handling exclusively heavy oil, which is not economically feasible to control based on analysis using currently available data.[77] For these reasons, CARB concluded that there are no new technologically feasible control measures that CARB can implement as a contingency measure in the Oil and Gas Methane Rule. The EPA agrees with CARB's evaluation and conclusion in this regard.

*Comment C–2:* CEV suggests that there are opportunities for additional reductions by strengthening and modernizing SJVUAPCD's ISR rule, to account for the growth of distribution centers and related truck traffic in the Valley. They suggest the rule be updated to include tracking of truck activities and suggest that updating the ISR rule could be a contingency measure for ozone.

*Response to Comment C–2:* Under CAA section 110(a)(5)(A), a state may include in a SIP any ISR program, but the EPA may not require the state to adopt an ISR program as a condition of approval of the SIP. Thus, the District may choose to revise the ISR rule that the District has adopted or adopt an additional ISR rule as a contingency measure, but the EPA cannot require the District to do so, even if adopting such a contingency measure would be feasible and would achieve emissions reductions within two years of the triggering event.

*Comment C–3:* CEV suggests that the Valley's contingency measure strategy include a pesticide-related contingency measure to reduce VOC emissions. They state that the pesticide category has been under-regulated in the Valley and that residents have expressed concerns about pesticide emissions.

*Response to Comment C–3:* CARB evaluated the potential for further reduction of VOCs from pesticide use as part of the development of their 2022 State Strategy for the State Implementation Plan ("2022 State SIP Strategy"). As adopted, the 2022 State SIP Strategy includes a pesticides-related committal measure.[78] Specifically, under the 2022 State SIP Strategy, the California Department of Pesticide Regulation (DPR) is committed to the development and implementation of a statewide regulation to address both cancer and acute risks to non-occupational bystanders from the use of 1,3-Dichloropropene (1,3–D), which is a VOC and is a fumigant used to control nematodes, insects, and disease organisms in soil.[79] This regulation is under development by DPR and will address cancer and acute risk from the use of 1,3–D by shifting to application methods with lower 1,3–D emissions or use of other measures to reduce exposure.[80] DPR estimates that the regulation would reduce VOC emissions in the San Joaquin Valley by 0.4 tpd by 2037.[81]

Contingency measures are measures that are held in reserve until triggered by, for example, a determination by the EPA that an area has failed to attain the NAAQS by the applicable attainment date. Because this pesticides-related measure is intended to be implemented upon adoption and not to be held in reserve, it is unavailable for adoption as a contingency measure.

### D. Comments From Citizens Rulemaking Alliance (CRA)

*Comment D–1:* The CRA alleges that the EPA's proposed action suffers from procedural deficiencies under the Paperwork Reduction Act, the Regulatory Flexibility Act/Small Business Regulatory Enforcement Fairness Act (SBREFA), and the Unfunded Mandates Reform Act. The CRA asserts that the action, if finalized, would approve "contingency measures"

---

[72] SJVUAPCD, Ozone Contingency Measure State Implementation Plan Revision for the 2008 and 2015 8-hour Ozone Standards, April 25, 2024, sections 5.1 through 5.5.

[73] Id., section 5.4.

[74] The five rules include District Rule 4401 ("Steam-Enhanced Crude Oil Production Wells"), Rule 4409 ("Components at Light Crude Oil Production Facilities, Natural Gas Production Facilities, and Natural Gas Processing Facilities"), Rule 4455 ("Components at Petroleum Refineries, Gas Liquids Processing Facilities, and Chemical Plants"), Rule 4623 ("Storage of Organic Liquids"), and Rule 4624 ("Transfer of Organic Liquids").

[75] SJVUAPCD, Ozone Contingency Measure State Implementation Plan Revision for the 2008 and 2015 8-hour Ozone Standards, April 25, 2024, section 5.4.

[76] Id., pages 60–66.

[77] Id., page 62.

[78] CARB, 2022 State Strategy for the State Implementation Plan, adopted September 22, 2022, pp. 104 and 105.

[79] Id.

[80] CARB, CARB Review of the San Joaquin Valley 2022 Plan for the 70 ppb 8-Hour Ozone Standard, Staff Report, Release Date: December 16, 2022. Pp. 17–18.

[81] Id., at 18.

**13760** **Federal Register** / Vol. 91, No. 55 / Monday, March 23, 2026 / Rules and Regulations

for the San Joaquin Valley for the 1997 ozone NAAQS under CAA sections 110(k) and 172(c)(9). By doing so, the CRA contends the EPA would federalize the contingency measures and impose obligations that carry concrete, foreseeable impacts on small entities in the San Joaquin Valley and incorporate information collection and fee/reporting requirements that require proper review under the Paperwork Reduction Act, the Regulatory Flexibility Act/SBREFA, and the Unfunded Mandates Reform Act.

In addition, even if the EPA ultimately concludes that the action is not economically significant for the purposes of Executive Order (E.O.) 12866, the CRA contends that the EPA should either submit the action for review under the E.O. or explain why it does not meet the criteria of section 3(f)(4) of the E.O.. The CRA asks the EPA to supplement the record, conduct the required analyses (or narrow the approval accordingly), and to extend the comment period by at least 60 days to allow members of the public to review any additional analyses that EPA may provide.

*Response to Comment D–1:* We disagree that further analysis is required or appropriate under the Paperwork Reduction Act, Regulatory Flexibility Act/SBREFA, or the Unfunded Mandates Reform Act, and thus, there is no need to extend the comment period.

In the action that the EPA is finalizing in this document, the EPA is approving the Smog Check Contingency Measure SIP as meeting the attainment-related contingency measure requirements of CAA section 172(c)(9) and as fulfilling the State's commitment made in connection with the EPA's approval of the 1997 ozone NAAQS plan for San Joaquin Valley. The EPA is not approving any contingency measure into the SIP. The Smog Check Contingency Measure SIP relies on the Smog Check Contingency Measure, which the EPA approved in a separate action published at 89 FR 56222 (July 9, 2024). Thus, even if we agreed that approval of control measures or contingency measures as part of a SIP imposes obligations that the EPA must evaluate under the Paperwork Reduction Act, the Regulatory Flexibility Act/SBREFA, and the Unfunded Mandates Reform Act, which we do not, there would be no obligations to evaluate with respect to this particular SIP action because we are not approving any specific measures as part of this action. Rather, we are finding that the measure that we previously approved, in conjunction with the State's justification for not adopting contingency measures

sufficient to provide for emissions reductions amounting to OYW of progress, meets the attainment-related SIP requirements of CAA section 172(c)(9) for the San Joaquin Valley for the 1997 ozone NAAQS.

Second, this action is not a significant regulatory action subject to Office of Management and Budget (OMB) review under E.O. 12866 (''Regulatory Planning and Review'') because it is a SIP approval, which is a category of regulations that has been exempted from review under section 3(d)(4) of E.O. 12866.[82] Section 3(f)(4) of the E.O.,[83] which identifies a type of ''significant regulatory action'' under the E.O., is not relevant because ''significant regulatory action'' is a type of ''regulatory action'' that is defined by reference to the terms ''regulation'' or ''rule,'' and SIP approvals are exempt from consideration as a ''regulation'' or ''rule'' for the propose of the E.O.

*E. Comments From Concerned Citizen*

*Comment E–1:* This commenter asserts that the EPA has not adequately demonstrated a rational connection between the facts found and the choice made, citing *Motor Vehicle Manufacturers Assoc.* v. *State Farm Mutual Automobile Insurance Co.,* 463 U.S. 29 (1983). The commenter also states that where an agency changes policy or adopts a position with foreseeable public health implications, it must provide a reasoned explanation supported by evidence and that the proposed rule fails to meet this standard. The commenter also asserts:

• The EPA has an obligation to assess cumulative impacts and disproportionate effects on overburdened communities, consistent with Executive Order 12898 and EPA's environmental justice guidance;

• In connection with any EPA action that elevates risks of increased emissions, delayed compliance, or weakened oversight, which directly threatens protected interests, the EPA must demonstrate that the proposed action will not result in adverse public health outcomes; and

• The EPA must consider reasonable alternatives that would achieve

statutory objectives with less risk to public health and the environment.

*Response to Comment E–1:* The commenter does not indicate in what way the EPA has not adequately demonstrated a rational connection between the facts found and the choice made or in what way the proposed rule fails to provide a reasoned explanation supported by evidence. To the extent that the commenter is referring to the EPA's reliance on the principles in the Revised Contingency Measure Guidance, we provide our explanation for, and application of, the principles in the guidance in section 1 of the Revised Contingency Measure Guidance and section III.B. of the proposed rule. We disagree with the other comments for the following reasons:

• The EPA does not have an obligation to assess cumulative impacts and disproportionate effects on overburdened communities, consistent with Executive Order 12898 and EPA's environmental justice guidance because Executive Orders 12898, 14094, and 14096 have been rescinded and because those three executive orders were the foundation for the development of the EPA environmental justice guidance.[84]

• The final action that the EPA is taking in this document would not increase emissions, delay compliance, or weaken oversight. The final action approves a SIP submission as meeting the attainment-related contingency measure requirements under CAA section 172(c)(9) for the San Joaquin Valley for the 1997 ozone NAAQS and finds that the State has fulfilled a commitment made in connection with the EPA's 2012 approval of the attainment plan for the San Joaquin Valley for the 1997 ozone NAAQS.

• The EPA is not required to consider reasonable alternatives that would achieve statutory objectives with less risk to public health and the environment. Under the CAA, the EPA is required to approve a SIP submission that complies with the provisions of the Act and applicable Federal regulations. 42 U.S.C. 7410(k); 40 CFR 52.02(a). Thus, in reviewing SIP submissions, the EPA's role is to approve state choices, provided that they meet the criteria of the CAA. In this role, EPA is not required to compel the state to consider alternatives to the choices made by the state, provided that the state's choices meet the criteria of the CAA. In this instance, the EPA is concluding that the submission by the State meets the

---

[82] See, Memorandum dated October 12, 1993, from: Sally Katzen, Administrator, Office of Information and Regulatory Affairs, Subject: Guidance for Implementing E.O. 12866, Appendix C (listing ''rules that unconditionally approve revisions to State Implementation Plans'' as exempted from review).

[83] Section 3(f)(4) of E.O. 12866 provides that '' 'Significant regulatory action' means any regulatory action that is likely to result in a rule that may: . . . (4) Raise novel legal or policy issues arising out of legal mandates, the President's priorities, or the principles set forth in this Executive order.''

[84] Signed by the President on January 20, 2025, Executive Order 14148 rescinded Executive Orders 14094 and 14096. Signed by the President on January 21, 2025, Executive Order 14173 rescinded Executive Order 12898.

applicable requirements, and for that reason, we are not required to compel the State to consider alternatives.

*F. Comments From Anonymous Commenters*

*Comment F–1:* The anonymous commenters both assert that the 1997 ozone standard and related requirements are insufficient to address the air quality problems in the San Joaquin Valley. One of the anonymous commenters also notes that the contingency measure submitted for the 1997 ozone standard is not adequate for the area because it only targets one source: pollution from vehicles. This commenter notes that there are other sources of emissions that could potentially be controlled in the Valley and points out that the contingency measures proposed for the 2008 and 2015 ozone NAAQS include measures that aim to reduce emissions from other sources, such as coatings and paints. This commenter also suggests additional contingency measures such as VOC emissions from industrial and agricultural sources.

*Response to Comment F–1:* We note that the EPA continues to review and update, when necessary, the national ambient air quality standards (NAAQS) for ozone and other pollutants. Subsequent to setting the eight-hour ozone NAAQS in 1997, the EPA tightened the ozone NAAQS from 0.08 ppm to 0.075 ppm (in 2008) and then to 0.070 ppm (in 2015). The EPA works with states to implement the 2008 and 2015 ozone NAAQS through review and action on updated rules and regulations and other required SIP revisions.

Meanwhile, CARB and the District have adopted and continue to implement control measures that go beyond the measures that were relied upon in the attainment demonstration for the 1997 ozone NAAQS, such as those that target trucks, consumer products, and agricultural burning for additional reductions,[85] and that will continue to provide for emissions reductions within the San Joaquin Valley into the future. Due to these measures, CARB and the District predict Valley-wide emissions reductions of 35 percent and 5 percent of $NO_X$ and VOC, respectively, between 2023 (the modeled attainment year for the 1997 ozone NAAQS) and 2031 (the attainment year for the 2008 ozone NAAQS) based on implementation of

control measures adopted prior to 2022.[86]

With regard to SIP requirements for contingency measures, we expect to take action on SIP submissions for the 2008 and 2015 ozone NAAQS for San Joaquin Valley in the near future. Notwithstanding these upcoming actions, the EPA continues to implement the 1997 ozone NAAQS for certain anti-backsliding purposes, such as contingency measures and the section 185 fee program (fees on sources in the area levied upon failure to attain).

### III. EPA Action

For the reasons set forth in our proposed rule and in our responses to comments, we are taking final action to approve the Smog Check Contingency Measure SIP with respect to the CAA's attainment-related contingency measure requirement under CAA section 172(c)(9) for the San Joaquin Valley area for the 1997 ozone NAAQS. Our approval relies on the previously-approved contingency measure for the 1997 ozone NAAQS for the San Joaquin Valley (*i.e.,* the Smog Check Contingency Measure) and the justifications from CARB and the District for not adopting additional contingency measures to provide for the recommended amount of emissions reductions for such measures. Based on this approval, the EPA is also taking final action to determine that the State of California has fulfilled the commitment made by the State in connection with a previous approval action to develop, adopt, and submit attainment contingency measures for the San Joaquin Valley for the 1997 ozone NAAQS meeting the requirements of CAA section 172(c)(9).

### IV. Statutory and Executive Order Reviews

Under the CAA, the Administrator is required to approve a SIP submission that complies with the provisions of the Act and applicable federal regulations. 42 U.S.C. 7410(k); 40 CFR 52.02(a). Thus, in reviewing SIP submissions, the EPA's role is to approve state choices, provided that they meet the criteria of the Clean Air Act. Accordingly, this action merely approves state law as meeting federal requirements and does

not impose additional requirements beyond those imposed by state law. For that reason, this action:

• Is not a significant regulatory action subject to review by the OMB under Executive Order 12866 (58 FR 51735, October 4, 1993);

• Is not subject to Executive Order 14192 (90 FR 9065, February 6, 2025) because SIP actions are exempt from review under Executive Order 12866;

• Does not impose an information collection burden under the provisions of the Paperwork Reduction Act (44 U.S.C. 3501 *et seq.*);

• Is certified as not having a significant economic impact on a substantial number of small entities under the Regulatory Flexibility Act (5 U.S.C. 601 *et seq.*);

• Does not contain any unfunded mandate or significantly or uniquely affect small governments, as described in the Unfunded Mandates Reform Act of 1995 (Pub. L. 104–4);

• Does not have federalism implications as specified in Executive Order 13132 (64 FR 43255, August 10, 1999);

• Is not subject to Executive Order 13045 (62 FR 19885, April 23, 1997) because it approves a state program;

• Is not a significant regulatory action subject to Executive Order 13211 (66 FR 28355, May 22, 2001); and

• Is not subject to requirements of section 12(d) of the National Technology Transfer and Advancement Act of 1995 (15 U.S.C. 272 note) because application of those requirements would be inconsistent with the CAA.

In addition, the SIP is not approved to apply on any Indian reservation land or in any other area where the EPA or an Indian Tribe has demonstrated that a Tribe has jurisdiction. In those areas of Indian country, the rule does not have Tribal implications and will not impose substantial direct costs on Tribal governments or preempt Tribal law as specified by Executive Order 13175 (65 FR 67249, November 9, 2000).

This action is subject to the Congressional Review Act (CRA), and the EPA will submit a rule report to each House of the Congress and to the Comptroller General of the United States. This action is not a ''major rule'' as defined by 5 U.S.C. 804(2).

Under section 307(b)(1) of the CAA, petitions for judicial review of this action must be filed in the United States Court of Appeals for the appropriate circuit by May 22, 2026. Filing a petition for reconsideration by the Administrator of this final rule does not affect the finality of this action for the purposes of judicial review nor does it extend the time within which a petition

---

[85] See, *e.g.,* EPA's approval of the Heavy-Duty Vehicle Inspection and Maintenance Regulations at 91 FR 5325 (February 6, 2026); the Consumer Product Amendments at 85 FR 57703 (September 16, 2020); and the new restrictions on agricultural burning at 87 FR 36222 (June 16, 2022).

[86] The District's *2022 Plan for the 2015 8-Hour Ozone Standard* (adopted December 15, 2022) presents a summary of baseline emissions projections in appendix B (''Emissions Inventory''). The percentage reductions cited herein are based on the emissions projections in tables B–1 and B–2 in appendix B. Specifically, table B–1 shows a reduction in $NO_X$ emissions from 157.8 tons per day (tpd) in 2023 to 103.2 tpd in 2031. For VOC, emissions are projected to decrease from 305.8 tpd in 2023 to 290.5 tpd in 2031.

**13762** **Federal Register** / Vol. 91, No. 55 / Monday, March 23, 2026 / Rules and Regulations

for judicial review may be filed, and shall not postpone the effectiveness of such rule or action. This action may not be challenged later in proceedings to enforce its requirements (see section 307(b)(2)).

## List of Subjects in 40 CFR Part 52

Environmental protection, Air pollution control, Incorporation by reference, Intergovernmental relations, Nitrogen oxides, Ozone, Reporting and recordkeeping requirements, Volatile organic compounds.

**Authority:** 42 U.S.C. 7401 *et seq.*

Dated: March 9, 2026.

**Michael Martucci,**

*Acting Regional Administrator, Region IX.*

[FR Doc. 2026–05592 Filed 3–20–26; 8:45 am]

**BILLING CODE 6560–50–P**

---

## ENVIRONMENTAL PROTECTION AGENCY

### 40 CFR Part 52

**[EPA–R06–OAR–2020–0164; FRL–12896–02–R6]**

### Air Plan Approval; Texas; Reasonably Available Control Technology in the Dallas-Fort Worth Ozone Nonattainment Area

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Final rule.

**SUMMARY:** Pursuant to the Federal Clean Air Act (CAA or the Act), the Environmental Protection Agency (EPA) is approving revisions to the Texas State Implementation Plan (SIP), concerning volatile organic compounds (VOC) and nitrogen oxides (NO$_X$) Reasonably Available Control Technology (RACT) requirements for the Dallas-Fort Worth (DFW), 2008 8-hour ozone National Ambient Air Quality Standards (NAAQS) Serious nonattainment area (NAA). The revisions were submitted by the State of Texas on May 12, 2020, and May 13, 2020. The EPA is approving revisions to 30 Texas Administrative Code (TAC) Chapters 115 and 117 to implement the major source RACT requirements for VOC and NO$_X$ as addressed in the RACT analysis and negative declarations included in the Serious area Attainment Demonstration (AD) SIP revision.

**DATES:** This rule is effective on April 22, 2026.

**ADDRESSES:** The EPA has established a docket for this action under Docket ID No. EPA–R06–OAR–2020–0164. All documents in the docket are listed on the *https://www.regulations.gov*

website. Although listed in the index, some information is not publicly available, *e.g.,* Confidential Business Information or other information whose disclosure is restricted by statute. Certain other material, such as copyrighted material, is not placed on the internet. Publicly available docket materials are available electronically through *https://www.regulations.gov.*

**FOR FURTHER INFORMATION CONTACT:** Ms. Anupa Ahuja, 214–665–2701, *ahuja.anupa@epa.gov,* and Emad Shahin, 214–665–6717, *emad.shahin@ epa.gov,* EPA Region 6 Office, Infrastructure and Ozone Section.

**SUPPLEMENTARY INFORMATION:** Throughout this document ''we,'' ''us,'' and ''our'' means the EPA.

### I. Background

The background for this action is discussed in detail in our July 24, 2025 [1] and September 5, 2025 [2] proposals (referred to as the ''proposals''). In those actions we proposed to approve Texas' May 13, 2020, RACT SIP revision and May 12, 2020, SIP revision to 30 TAC Chapter 115 and Chapter 117 as meeting the 2008 8-hour ozone Serious classification RACT level control requirements consistent with section 172(c)(1) and 182 of the CAA. The EPA's July 24, 2025, action proposed to determine that the Texas SIP revisions fulfill the Serious NO$_X$ RACT requirements for the DFW NAA for the 2008 ozone NAAQS and to approve the concurrent Chapter 117 rule revisions. The EPA's September 5, 2025, action proposed to determine that the Texas SIP revisions meet the Serious RACT requirements for CTG and non-CTG VOC major sources [3] for the 2008 ozone NAAQS and to approve the concurrent Chapter 115 rule revisions. The relevant Texas SIP revisions included Texas' finding that previously approved federally enforceable limits on cement kilns continue to fulfill RACT requirements, and CTG RACT negative declarations for the following categories of sources fiberglass boat manufacturing materials, surface coating for flat wood paneling, letterpress printing, shipbuilding and ship repair surface coating operations, vegetable oil manufacturing, and rubber tire manufacturing categories. Texas also submitted negative declarations for several CTG categories for Wise County: graphic arts—rotogravure and

flexography, flexible package printing, refinery vacuum producing systems and process unit turnarounds, wood furniture manufacturing, and manufacture of synthesized pharmaceutical products. Texas stated in its May 13, 2020, submittal that it did not locate any major sources subject to the NO$_X$ Emissions from Nitric or Adipic Acid Manufacturing Alternative Control Techniques (ACT) document. The EPA has already taken final action through a different rulemaking process to approve the requirement for implementation of RACT for sources covered by the 2016 Oil and Natural Gas Industry Control Techniques Guidelines (CTG).[4]

During the EPA's July and September 2025 public comment periods, the EPA received a total of six comments on our proposals. As explained in further detail below, several comments were received on a NO$_X$ Technical Support Document (TSD) that is not associated with this action and those comments do not reflect our evaluation of Texas' RACT SIP submittal or current Texas rules. In the NO$_X$ TSD associated with this action, the EPA gathered and analyzed relevant information including Texas' rulemaking record which contained information on specific control technologies and technical and economic feasibility for the Emissions Specifications for Attainment Demonstration (ESAD) rates, Texas Register documents which included Texas' response to comments on the rulemaking, and recent documents issued by EPA (such as the 2017 OTC Draft White Paper on Control Technologies, OTC State Regulations from Eight Source Categories, 2019 OTC State Regulations from Eight Source Categories, and 2019 OTC Regulatory and Technical Guideline for Control of Nitrogen Oxides (NO$_X$), and Emissions from Natural Gas Pipeline Compressor Fuel-Fired Prime Movers). In the VOC TSD for this action, the EPA gathered and analyzed relevant information including comparing Texas' CTGs and non-CTG major source RACT rules to other relevant state VOC RACT rules, and reviewed EPA's RACT/BACT/LAER Clearinghouse (RBLC), NSPS, MACT standards, and NESHAPs, where applicable. Consistent with this analysis, we proposed to determine that Texas' EPA-previously-approved Chapters 115 and 117 rules still fulfill the RACT level of control requirements

---

[1] 90 FR 34812 (July 24, 2025).

[2] 90 FR 42885 (September 5, 2025).

[3] Sources emitting VOCs in a quantity greater than the Serious area major source definition (50 tpy) and not covered by a CTG category or previously approved RACT rule.

[4] The EPA's approval of the revisions to the Texas SIP concerning RACT requirements for sources covered by the 2016 Oil and Natural Gas Control Techniques Guidelines (CTG) for the DFW and HGB. nonattainment areas under the 2008 ozone NAAQS. See 88 FR 55379 (August 15, 2023).